**CHUN KING SALES, Inc., and Jeno F. Paulucci, Plaintiffs,**

v.

**ORIENTAL FOODS, Inc., Defendant.**

No. 17882.

United States District Court
S. D. California, Central Division.

Dec. 13, 1955.

Williamson, Schroeder, Adams & Myers, Everett J. Schroeder, Minneapolis, Minn., and Lyon & Lyon, Lewis E. Lyon, R. Douglas Lyon, Los Angeles, Cal., for plaintiffs.

Harris, Kiech, Foster & Harris, Ford Harris, Jr., Los Angeles, Cal., for defendant.

YANKWICH, Chief Judge.

The plaintiff by this action seeks injunction and damages for patent infringement and unfair competition. 28 U.S.C.A. § 1338(a) and (b). The patent involved is No. 2,679,281, issued on May 25, 1954, to Jeno Francis Paulucci. The defendant denies infringement, challenges the validity of the patent, and, in a counterclaim, asks for a declaration of invalidity. While the original pleadings as to the cause of action for infringement related to all three claims of the patent in suit, the plaintiff, at the trial, restricted itself to a charge of infringement of Claim 1 only.

## I

## Validity and Infringement

The object of the patent in suit is to join cans so that canned foods might be sold together and is on "a method and means for securing cans together in end-to-end relationship." Claim 1 describes it:

"1. The method of securing two cans together said cans having beaded ends protruding beyond their side walls, comprising (1) alining said cans in end-to-end relationship with adjacent end beads of said cans abutting each other, (2) stretching a portion of a slightly resilient sticky tape and applying said portion of said tape over por- tions of the abutting beads and adjacent side walls of said cans while said tape is in a stretched condition to secure said cans together; (3) pulling on the portion of said tape not secured to said can in a direction substantially tangential to the periphery of the cans to place same in a stretched condition to cause said tape to be applied and adhere to the remainder of the periphery of said beads and adjacent side walls of said cans."

[*For convenience of reference, we have numbered the three elements of the claim.*] [1]

While the scope of the claim is narrow, it represents invention over the prior art. 35 U.S.C.A. § 103; Pointer v. Six-Wheel Corp., 9 Cir., 1949, 177 F.2d 153, 160–161; Pacific Contact Laboratories v. Solex Laboratories, 9 Cir., 1953, 209 F.2d 529, 532–533; Jeoffroy Mfg. Co. v. Graham, 5 Cir., 1953, 206 F.2d 772, 776–778; Stearns v. Tinker & Rasor, 9 Cir., 1955, 220 F.2d 49, 57–58. There is no merit to the contention that it is anticipated in the prior art. 35 U.S.C.A. § 102. Admittedly, the two best references (T. H. Nifong, 2120504, June 14, 1938, and Arnold E. Johnson, 2652166, September 15, 1953) do not contain the element which we have marked (2). There is no method in either for applying tension to or stretching the tape either before or after application in order to cause it to pass around an irregular contour so as to secure, in effect, a welding as set forth in the patent in suit. There is, therefore, absent an important element of the method and the desirable result which its combination with the other elements achieves. And there can be no anticipation unless all the elements of the invention or their equivalents are found in a prior invention where they achieve the result in substantially the same manner. Bianchi v. Barili, 9 Cir., 1948, 168 F.2d 793, 795–796; Allied Wheel Products v. Rude, 6 Cir., 1953, 206 F.2d 752, 755–756.

---

1. The Letters Patent are attached as Exhibit A at the end of the opinion.

The burden of establishing anticipation rests heavily on him who charges it. Radio Corp. of America v. Radio Engineering Laboratories, 1934, 293 U.S. 1, 7–9, 55 S.Ct. 928, 79 L.Ed. 163; Marconi Wireless Co. of America v. United States, 1943, 320 U.S. 1, 34–35, 63 S.Ct. 1393, 87 L.Ed. 1731; Paraffine Companies v. McEverlast, Inc., 9 Cir., 1936, 84 F.2d 335, 339; Insul-Wool Insulation Corp. v. Home Insulation, 10 Cir., 1949, 176 F.2d 502, 504–505.

There is evidence in the record that the Minnesota Mining & Manufacturing Company made several attempts to construct a machine for the plaintiff for the purpose of achieving the result finally attained by this invention. They were interested in selling to the plaintiff their patented tape. Their employees were allowed on the premises of the plaintiff to see, and participated in, the experiments being carried on. Whether they were pledged to secrecy *is not* material. They knew that experiments were being carried on and the plaintiff had the right to rely on the decencies of ethical conduct which forbid a concern dealing with another to disclose to others experimental demonstrations and uses carried on in order to enable the two parties to deal in the future on more favorable terms.

I am quite certain that the Minnesota Mining & Manufacturing Company *did not* act with deception. And there is direct testimony in the record that their representatives, who saw certain experiments anticipatory of the invention, understood that these were private experimental attempts to achieve certain results and *did not* amount to public disclosure or use of the method that was later patented. It would be a sad commentary on the ethics of business, indeed, if, on the basis of the facts disclosed here, an infringer could benefit by what would be a breach of trust. But ethics aside, legally the efforts were purely experimental, did not amount to public use, and were not anticipatory. Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 20, 613, 616, 69 S.Ct. 675, 83 L.Ed. 1071; Merrill v. Builders

Ornamental Iron Co., 10 Cir., 1952, 197 F.2d 16, 18–19; Pacific Contact Laboratories v. Solex Laboratories, 9 Cir., 1953, 209 F.2d 529, 534. More, the experiments were not successful as the models constructed with the aid of Minnesota Mining & Manufacturing Company proved unworkable. Only after their abandonment was the present novel and successful invention devised.

"* * * And a prior unsuccessful experiment does not constitute invention and cannot therefore be an anticipation." Pacific Contact Laboratories v. Solex Laboratories, supra, 209 F.2d at page 532.

So the claim of invalidity by reason of prior public disclosure or use in 1950 or 1951 made in the counterclaim must fail.

The method used by the defendant infringes Claim 1, for it uses, without deviation, the four steps described in the Claim, as was clearly demonstrated when the machine was operated at the trial. While thus satisfied that there has been deliberate infringement of the plaintiff's patented method, I am of the view that the plaintiff is not entitled to recover on the claim or cause of action for unfair competition. 28 U.S.C.A. § 1338(b).

## II

### Tests for Determining Unfair Practices

Unfair competition or unfair practices are condemned because they lead to confusion of sources or sponsorship of goods. Restatement, Torts, § 728. The test for determining the existence or non-existence of confusing similarity has been stated in this manner:

"The ultimate test of whether or not there is a confusing similarity between a designation and a trademark or trade name which it is alleged to infringe is the effect in the market in which they are used. In some cases the probable effect can be determined by a mere comparison of the designation with the trade-mark or trade name. In other cases extrinsic evidence may be necessary. In any event, the issue is whether an

appreciable number of prospective purchasers of the goods or services in connection with which the designation and the trade-mark or trade name are used are likely to regard them as indicating the same source. *That a few particularly undiscerning prospective purchasers might be so misled is not enough. On the other hand, it is enough that an appreciable number of purchasers are likely to be so misled, even though by exercising greater discernment they could avoid the error."* Restatement, Torts, § 728. [Emphasis added.]

In most cases of this character, instances of actual confusion by purchasers are offered and received in evidence. Surveys and polls conducted by individuals or research organizations are also used. Laskowitz v. Marie Designer, Inc., D.C.Cal.1954, 119 F.Supp. 541, 550; Note, Public Opinion Surveys as Evidence, 1953, 66 Harv.L.Rev., p. 498.

■ There is no such evidence in this case. We are, therefore, to determine whether,—to paraphrase the language of the Restatement—an appreciable number of prospective purchasers of the goods are *likely* to regard them as coming from the same source. So doing, we disregard what the Restatement calls "the undiscriminating prospective purchaser", and are guided by the effect upon the person who looks for brand names. Restatement, Torts, § 717, Comment (b); § 727.

The test by which is determined the likelihood that confusion might be engendered in a purchaser's mind is given in the Restatement in this manner:

"* * * Under the rule stated in this Section, the likelihood that prospective purchasers will regard the use of the designation in the manner stated must *be substantial. That there is a very remote possibility that prospective purchasers generally will so regard the use is not enough. Nor is it enough that there is strong likelihood that one or two prospective purchasers will be so misled.* On the other hand, the rule

does not require a probability of general confusion among most of the prospective purchasers. Compare § 728, Comment (a)." Restatement, Torts, § 727. [Emphasis added.]

See, Restatement, Torts, § 730, Comment (b).

■ *These criteria have the approval of California courts.* Scudder Food Products v. Ginsberg, 1943, 21 C.2d 596, 599–602, 134 P.2d 255; Weatherford v. Eytchison, 1949, 90 Cal.App.2d 379, 384, 202 P.2d 1040; Schwartz v. Slenderella Systems of Cal., 1954, 43 Cal.2d 107, 112, 271 P.2d 857; Sunlite Bakery v. Homekraft Baking Co., 1953, 119 Cal.App.2d 148, 150, 259 P.2d 711. And in their application, *similarity* and *not complete identity* is the determinant factor. Jackman v. Mau, 1947, 78 Cal.App.2d 234, 239, 177 P.2d 599; American Distilling Co. v. Bellows & Co., Inc., 1951, 102 Cal. App.2d 8, 23, 226 P.2d 751; Palmer v. Gulf Pub. Co., D.C.Cal.1948, 79 F.Supp. 731; Lane Bryant, Inc., v. Maternity Lane, Ltd., 9 Cir., 1949, 173 F.2d 559, 564; and see, Comment: Trade Name, Infringement as Unfair Competition, 1952, 40 Cal.L.Rev. 571; Note, Trade-Marks, Unfair Competition and the Courts, 1953, 66 Harv.L.Rev. 1094.

■ If a secondary meaning is established, *any copying* may be unfair competition. However,

"To establish secondary meaning, the article itself must be so clearly identified with *its* source that its supply from any other source is clearly calculated *to deceive the public and lead it to purchase the goods of one for that of another.* Sinko v. Snow-Craggs Corp., 7 Cir., 105 F.2d 450. To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source,' and not the negative inquiry as to, 'Who makes that article?' In other words, the article must proclaim its identification with

its source, and not simply stimulate inquiry about it." Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 7 Cir., 1943, 133 F.2d 266, 270. [Emphasis added.]

## III

### No Confusing Similarity

In the case before us, similarity is claimed in the use of colors and illustrations in combination on labels for cans and cartons. The primary colors of the spectrum are seven in number. A person cannot acquire a right to use colors singly or in combination. The law will not give protection unless colors are combined with design or symbols in such a manner as to become a distinctive means of identifying one's product. Otherwise put, only colorable imitation of a distinct form which amounts to a fraudulent appropriation of another person's original design will be protected. See, Modesto Creamery v. Stanislaus Creamery Co., 1914, 168 Cal. 289, 142 P. 845; Southern California Fish Co. v. White Star Canning Co., 1920, 45 Cal.App. 426, 431–432, 187 P. 981; Eastern-Columbia, Inc., v. Waldman, 1947, 30 Cal.2d 268, 181 P.2d 865; Smith, Kline & French Laboratories v. Clark & Clark, 3 Cir., 1946, 157 F.2d 725, 729–730; American Chicle Co. v. Topps Chewing Gum, 2 Cir., 1953, 208 F.2d 560; American Chicle Co. v. Topps Chewing Gum, 2 Cir., 1954, 210 F.2d 680; Smith, Kline & French Laboratories v. Heart Pharmaceutical Corporation, D.C.S.D.N.Y.1950, 90 F. Supp. 976; Esso Standard Oil Co. v. Bazerman, D.C.E.D.N.Y.1951, 99 F.Supp. 983; H. Moffat Co. v. Koftinow, 1951, 104 Cal.App.2d 560, 564–565, 232 P.2d 15; MacSweeney Enterprises, Inc., v. Tarantino, 1951, 106 Cal.App.2d 504, 510–514, 235 P.2d 266; Haeger Potteries v. Gilmer Potteries, D.C.Cal.1954, 123 F. Supp. 261.

The evidence in the record shows that the use by the defendants of colors and silhouettes or,—as one witness called them—"vignettes", on cans containing Chinese foods preceded by many years their use by the plaintiff. Indeed, the defendants were in the field of *selling canned oriental foods* long before the plaintiffs. Both California and federal law protect the first user: 15 U. S.C.A. § 1052(d), (e) (1), (f); California Bus. & Prof.Code, §§ 14270, 14400. But, in order to be guilty of unfair practice, the late-comer must imitate size, shape, style and color arrangement so as to produce a colorable imitation of the representation of his rival's product. American Distilling Co. v. Bellows & Co., 1951, 102 Cal.App.2d 8, 21–26, 226 P.2d 751; Scudder Food Products v. Ginsberg, 1943, 21 Cal.2d 596, 601–602, 134 P.2d 255; Albert Dickinson Co. v. Mellos Peanut Co., 7 Cir., 1950, 179 F.2d 265, 269–270. Side by side comparison is *not* conclusive. But, in determining likelihood to create confusion, the cases just cited teach that the *tout ensemble* of the article as it appears to the average buyer is to be considered. Doing this, it is quite apparent that there is no confusing similarity here. In both instances, there is a combination of colors, vignettes, pictures of dishes and words. But there is no imitation or simulation of the lettering, the form, the script, scrolls or any of the symbols used by the plaintiffs. The designation and pictorial representation of the foods and of the elements composing them are the same because the names such as chow mein, chop suey and the like, have been long known by these names, and have been made in certain combinations in Chinese cookery from time immemorial. And there can be no exclusive appropriation of an accepted method of designating the character, kind and composition of a product. Italian Swiss Colony v. Italian Vineyard Co., 1910, 158 Cal. 252, 257, 110 P. 913, 32 L.R.A.,N.S., 439; Scudder Food Products v. Ginsberg, 1943, 21 Cal.2d 596, 600, 134 P.2d 255.

An examination of the *tout ensemble* of the labels on cans that have been pointed to as the most likely to cause confusion (Exhibits 3 and 3A— cans containing "chop suey") show such deviation in pattern, description and arrangement that it is unlikely that a person looking for the Chun King brand would pick up the can distinctly marked

Jan-U-Wine which is the defendant's brand. There is no attempt to imitate the script. Even the height of the cans is not the same. Indeed, while the two colors are yellow and red, the shades are different. A casual buyer who *did not buy* by the brand might pick up one can for the other. But in that case, he is *not* the plaintiff's *prospective* customer. On the contrary, he is in the market for *Chinese food* and his selection of one in preference to the other does not involve the *type of choice* as to which the law is anxious to avoid confusing deception. As stated by the Court in Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 1942, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381:

> "If it is true that we live by symbols, *it is no less true that we purchase goods by them.* A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—*to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears.* Once this is attained, the trade-mark owner has something of value. *If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress."* [Emphasis added.]

A trade symbol must be attached to a product. And unless the product has become identified with the symbol, the law does not protect against competitors who sell the identical product. Where, as here, there is *no* evidence of actual confusion, the Court, in determining the likelihood of confusion, must attempt to "approximate the position of an ordinary purchaser." Rudolf Callman, 1950, The Law of Unfair Competition and Trade-Marks. 2 Ed., Vol. 3, § 81.1, p. 1376. Of necessity, such approximation involves factors often unprecise, and, at times, imponderable. As stated by the Court of Appeals for the Seventh Circuit in Colburn v. Puritan Mills, Inc., 7 Cir., 1939, 108 F.2d 377, 378:

> "The ascertainment of probability of confusion because of similarity of trade names presents a problem not solvable by a precise rule or measure. *Rather is it a matter of varying human reactions to situations incapable of exact appraisement.* * * * *Is the similarity of name or dress such as to delude the public or will the prospective buyer readily differentiate between the two names? We can only contemplate, speculate, and weigh the probabilities of deception arising from the similarities and conclude as our, and the District Judge's, reactions persuade us."* [Emphasis added.]

And see, Albert Dickinson Co. v. Mellos Peanut Co., 7 Cir., 1950, 179 F.2d 265, 269–270.

The sale of Chinese foods in combination cans *was not* an innovation of the plaintiff. The plaintiffs are entitled to the benefit of such custom as they have developed, *even as a newcomer.* But they *are not* entitled to a monopoly of the field. Nor are they entitled to be *free from competition* in the choice of what the Supreme Court has called "congenial symbols", Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., supra, whether they relate to color, lettering, illustrations or other embellishments aiming to attract the potential customers unless one of two conditions is fulfilled,—(1) that there is an actual showing of confusion of source. Sunbeam Corporation v. Sunbeam Lighting Co., D.C.Cal.1949, 83 F.Supp. 429; Sunbeam Corporation v. Sunbeam Lighting Co., 9 Cir., 1950, 183 F.2d 969; Sunbeam Corporation v. Sunbeam Furniture Corp., D.C.Cal.1950, 88 F.Supp. 852; Sunbeam Furniture Corp. v. Sunbeam Corporation, 9 Cir., 1950, 191 F.2d 141; Silvers v. Russell, D.C.Cal.1953, 113 F.Supp. 119, or (2) that there is likelihood of such confusion. Palmer v. Gulf Pub. Co., D.C.Cal.1948, 79 F.Supp. 731.

In what precedes we have already shown why the label relating to "beef chop suey" which presents the most numerous elements of similarity, does not, in the light of declared principles, infringe upon any of the rights of the plaintiffs. Nor, in our view, do the other labels or symbols on cans and cartons which have been pointed to in the evidence as showing confusing similarity, satisfy the legal norms of unfair practices. The language which the California District Court of Appeals used in a similar case in which a trial court actually granted injunctive relief against a color and figure combination used by fish canner could well sum up the reasons for denying relief in this case:

"Nor is plaintiff's case helped by the fact that dark blue, the color of the background, is the predominant color in both labels, though it is apparent that the gravamen of plaintiff's charge lies in an alleged imitative color scheme. It is the one specific feature emphasized by the plaintiff throughout its case. It is true that sometimes a color, taken in connection with other characteristics, may serve to distinguish one's goods, and thus be protected by the courts. Fairbanks Co. v. Bell Mfg. Co., 2 Cir., 77 F. 869, 23 C.C.A. 554 —a case where, however, there was proof of specific instances of deception. *But as a rule a color cannot be monopolized to distinguish a product. There are not more than seven primary colors, and if one of these may be appropriated as a distinguishing characteristic of a label, it would not take long to appropriate the rest. Thus, by appropriating the colors, the packing of tuna could be monopolized by a few vigilant concerns. To allow colors to be appropriated as distinguishing characteristics would foster monopoly by foreclosing the use by others of any tasty dress; and where the difference between plaintiff's and defendant's labels are so marked in other respects that, in the absence of identity of color, there can be no possibility of confusion, a charge of unfair competition falls to the ground.*" Southern California Fish Co. v. White Star Canning Co., 1920, 45 Cal.App. 426, 431, 187 P. 981, 983. [Emphasis added.]

Our own Court of Appeals has stated that there could be no recovery for unfair competition unless

"* * * *the name or appearance* of the injured product has acquired either a technical trade-mark or a secondary meaning." Ross-Whitney Corp. v. Smith, Kline & French Laboratories, 9 Cir., 1953, 207 F.2d 190, 196.

See, Pacific Contact Laboratories, Inc., v. Solex Laboratories, Inc., 9 Cir., 1953, 209 F.2d 529, 534.

The conditions which would give rise to a secondary meaning for the plaintiff's labels do not exist in this case. For the plaintiff's method of packaging or labelling has not become identified in the eyes of purchasers of Chinese foods with the plaintiff's product. See Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 7 Cir., 1943, 133 F.2d 266, 270. These considerations gain added strength when it is borne in mind that, as already appears, the defendant *preceded* the plaintiff in the field and that the use by it of distinctive identifying symbols singly and in combination preceded use by the plaintiff. To this situation the language of Judge Learned Hand in American Chicle Co. v. Topps Chewing Gum, 2 Cir., 1953, 208 F.2d 560, 563, is very apposite:

"It cannot be denied that courts have at times reasoned as though a second comer were free to divert a first comer's customers, if he confined himself to those who were unduly careless. If the issue were whether such buyers could complain that they did not get what they wanted, it might be an answer in the second comer's mouth that they had themselves to thank for their failure to look more closely at the 'make-up'; though even that is a doubtful answer. *Be that as it may, the issue becomes altogether different when it is between a first, and a second*

*comer, for the first comer's careless customers are as valuable to him as any others; and their carelessness can hardly be charged to him.* Why they should be deemed more legitimate game for a poacher than his careful buyers, it is hard to see, unless it be on the ground that he should have made his mark so conspicuous that it would serve to hold even the most heedless." [Emphasis added.]

Judgment will therefore be for the plaintiff on the first cause of action only that Claim 1 of the patent in suit is valid and infringed.

May 25, 1954    J. F. PAULUCCI    2,679,281

METHOD AND MEANS FOR SECURING CANS TOGETHER

Filed May 14, 1952

FIG. 3

FIG. 2

FIG. 4

FIG. 1

FIG. 5

INVENTOR.

JENO F. PAULUCCI

BY

*Richard P. Cardew*

AGENT

2,679,281

Patented May 25, 1954

# UNITED STATES PATENT OFFICE

2,679,281

## METHOD AND MEANS FOR SECURING CANS TOGETHER

Jeno Francis Paulucci, Duluth, Minn.

Application May 14, 1952, Serial No. 287,729

3 Claims. (Cl. 154—42.3)

This invention relates to a method and means for securing cans together in end to end relationship.

It has been customary for manufacturers to provide so-called "tie-in" sales, that is, you get one item free or for a small amount of money (for example, one cent) when you buy another item at the regular price. Such sales stimulate trade for the manufacturers by getting more people to try their product.

There has always been a problem present as to how to keep the items of the tie-in sales together for the convenience of the manufacturer, retailer, and purchaser. Elaborate boxes have been used to hold the tie-in items in their desired group relationship, however these boxes are quite expensive. Also, the groups have been secured to cards by means of glue and rubber bands, or rubber bands have been used to secure the items together but the resultant group is not stable and is annoying to handle. Metallic cans have been soldered together, however, this is quite expensive.

The securing of two canned goods products in a firm compact physical connection has always been a great problem for canned goods usually are heavy and cannot be glued to cards, rubber bands are not strong enough to hold the cans together securely, and soldering is difficult and expensive. Thus, there have been but few tie-in sales of canned goods products.

It is, therefore, one of my principal objects to provide a method and means for securing cans together for tie-in sales.

Another object is to provide such a method and means which is simple yet efficient, and not expensive.

Another object is to provide such a method and means which will secure even relatively heavy cans together firmly whereby the group of cans involved in a tie-in sale, usually two, may be handled by grasping either of the cans when assembled, thereby making it very convenient for packers in the manufacturing plant, retail clerks, and purchasers to handle the group and to maintain the sale goods in its desired assembled relationship at all times, rather than requiring sorting of the cans, or leaving a possibility that the tie-in sale goods might become separated either at the manufacturing plant, at the retail store, or at home. The goods is at all times ready for handling or use, and never is any searching necessary by anyone for the goods involved in the sale.

Another object is to provide a method and means for securing cans together which facilitates the stacking of the goods on shelves in a retail store or at home.

A more specific object is to provide a method and means for aligning two cans in end to end relationship and securing same in said relationship firmly for transportation and storage.

These and other objects and advantages of my invention will become more apparent as the description proceeds.

In the accompanying drawing forming a part of this application for patent:

Fig. 1 is a perspective view of two cans secured together by the method and means of my invention.

Fig. 2 is an enlarged fragmental view, partly in section, illustrating the way in which cans are secured together using a slightly resilient sticky tape tightly stretched around the cans.

Fig. 3 is a side elevational view showing how the cans are handled in securing them together.

Fig. 4 is an enlarged fragmental view taken at right angles to Fig. 2.

Fig. 5 is a view similar to Fig. 2 showing what happens: when a non-resilient tape is used in securing cans together, and if the tape is not stretched tightly around the cans.

In the drawing, the reference numeral 1 indicates a table or base on which a holder 2 for a roll O of tape 3 is secured in any desired manner. The holder 2 may be of any desired conventional type wherein means not shown but well known, is provided for rotatably carrying the roll of tape 3. It is preferred that the holder 2 include a tape cut-off blade 4 on a support 5, as shown for convenience in severing the tape when desired.

A trough 6, of V-shape in cross section, is secured to the base 1, as by screws 7 or the like, in spaced relation to the holder 2, as shown. The trough is provided to receive the cylindrical cans 3—3 whereby they are immediately alined axially for securing together. The trough 6 has an end member or closure 9 at one end thereof to act as a stop against which one of the cans abuts when the other can is pushed against said one of the cans so that the cans may be held snugly against each other. If only one size of can is to be processed in the trough 6, of course a second end member, not shown, may be provided on the opposite end of the trough whereby the trough length is fixed to be equal to the length of two cans end-to-end, for convenience in handling.

The tape 3 must be somewhat resilient or slightly stretchable in order to con-form to, or to be formed over, the beads 11 and 12 as the beads protrude beyond the side walls of the cans, as shown in Fig. 2 and form ridges over which the tape must be applied. I have found that cellophane tape serves the purpose here intended very well. There are some brands of common adhesive tape, masking tape, and the like which are also suitable for this use, however, cellophane tape seems to be easier to handle as it does not have the bulk of other tapes which are also adapted to this use.

The tape, as shown, is relatively narrow, it being preferable that one-half inch width tape be used. It is deemed apparent that a one-half inch wide tape is relatively narrow for use in taping two relatively heavy cans together in a manner which will hold same securely. However, it is the method of applying the tape which makes the narrow tape suitable for the purpose, as will become apparent.

It is deemed obvious that it is desirable from an economic standpoint to use a narrow tape for it is less expensive, however, the narrow tape would not be useable, nor would any tape of reasonable width be useable, if it were not known how to apply same for most efficient use.

### Operation

It will be readily seen that when two cans are placed in the trough 6 end-to-end they will be automatically alined axially, and one can be rotated axially sufficiently to bring the labels of the two alined cans into their desired relationship, it being desired, of course, that the front exposure of both labels be visible together when the cans are secured together.

With the cans thus alined and the labels also alined, the tape 3 is grasped by the operator, not shown, with the thumb and forefinger of one hand grasping the end 10 of the tape and the thumb and finger of the other hand grasping the tape in spaced relation to the end 10 of the tape, preferably about one and one-half to two inches behind the end 10 of the tape.

The tape is then pulled from the roll O, in which it is wound and carried, by the operator to a point over the center of the cans and at the point where the rolled upper bead 11 and lower bead 12 of adjacent and abutting case meet. The portion 14 of the tape between the operator's two hands is then stretched or pulled between the fingers of the two hands, by pulling the hands away from each other, and is maintained in stretched condition, under tension, as it is applied over the abutting beads 11 and 12. The stretched tape then readily forms itself to the contour of the beads and the adjacent side walls 13 of the cans 8, see Fig. 2, and adheres thereto in a manner which provides maximum gripping power for the tape on the cans.

The tape is then applied to the remainder of the periphery of the beads 11 and 12 and side walls 13 of the cans by the operator in the following manner:

The tape is cut off by means of the cutter 4, it being noted that by placing the trough 6 in a predetermined spaced relation from the cutter 4, the tape will be of the desired length to encircle the cans when cut off. The operator then grasps the newly cut end of the tape with the thumb and forefinger of one hand and pulls same away from the cans in a direction substantially tangential to the cans to apply tension to the tape and to stretch same slightly. As the tape is held in stretched condition, the operator rotates or rolls the two cans around axially in the trough 6 by engaging either of the cans, for they are held together by the initially applied portion 14 of the tape. The cans 8 are rolled or rotated by the operator in a direction tending to wind the tape onto the cans, and because of the stretched condition of the tape and the tension thereon, the latter is applied and secured to the cans entirely around their abutting beads 11 and 12 and adjacent side walls 13 in the manner shown in Fig. 2, as was the portion 14 of the tape initially applied.

The tape 3 is preferably of a length, or cut, so as to overlap its ends about one-half inch and the operator secures the end of the tape firmly in place after the length of tape has been secured entirely around the beads 11 and 12 as shown.

The result is a very neat package of two cans secured together very firmly and in a manner whereby they can not be pulled apart by hand. They can be taken apart when it is desired to use same cutting the tape along the slight indentation 15 which usually appears between the beads 11 and 12 when the tape is applied. This can be readily done with a kitchen knife, or with one's thumb or finger nail for the tape is stretched tight, and there is a space 16 immediately behind the central portion of the tape, as shown, which makes the fracturing of the tape very easy. Yet, when the tape is wrapped entirely around the beads 11 and 12 and side walls 13 as shown in Fig. 2 the composite package is very sturdy and secure.

By comparison, Fig. 5 shows what happens if a non-resilient tape 17 is wrapped around two abutting can beads 11 and 12. The tape will not conform to the beads, nor will it engage and adhere to the side walls 13 of the cans. There will be only a small contact area of the tape to the cans, and they may be readily pulled apart by hand.

The same picture as shown in Fig. 5 would be the case if resilient tape were applied to can beads but not under tension, or in a stretched condition as required in my invention.

Cans secured in the manner of my invention are very easy to handle, pack, stack or transport in a most convenient manner.

Having thus described my invention, what I claim is:

1. The method of securing two cans together, said cans having beaded ends protruding beyond their side walls, comprising: aligning said cans in end-to-end relationship with adjacent end beads of said cans abutting each other, stretching a portion of a slightly resilient sticky tape and applying said portion of said tape over portions of the abutting beads

and adjacent side walls of said cans while said tape is in a stretched condition to secure said cans together, pulling on the portion of said tape not secured to said can in a direction substantially tangential to the periphery of the cans to place same in a stretched condition, and rotating said cans on their longitudinal axes while said tape is in said stretched condition to cause said tape to be applied and adhere to the remainder of the periphery of said beads and adjacent side walls of said cans.

2. Means for securing cans together in end-to-end relationship comprising a base, a V-shaped trough secured to said base to receive said cans in said relationship and to permit the rotation of said cans together on their longitudinal axes, a holder carried on said base in spaced relation to said trough, means on said holder to receive and hold a roll of tape, and a cutter carried intermediate said trough and said means to guide and support said tape.

3. Means for securing cans together in end-to-end relationship comprising a base, a trough secured to said base to rotatably receive said cans in end-to-end relationship, a holder carried on said base in spaced relation to said trough, means on said holder to rotatably carry a roll of tape, a cutter carried intermediate said trough and said means to guide and support said tape, and said cutter being carried in predetermined spaced relationship to said trough whereby said tape may be cut off in a desired length.

References Cited in the file of this patent

UNITED STATES PATENTS

| Number | Name | Date |
|---|---|---|
| 921,855 | Loskamp | May 18, 1909 |
| 1,939,719 | Nicholls | Dec. 19, 1933 |
| 2,006,451 | Glidden | July 2, 1935 |
| 2,087,227 | Blum | Apr. 27, 1937 |
| 2,307,406 | Howard | Jan. 5, 1943 |
| 2,326,414 | Thomson | Aug. 10, 1943 |
| 2,444,830 | Kellgren et al. | July 6, 1948 |
| 2,502,635 | Swartz | Apr. 4, 1950 |
| 2,587,685 | Bergstein | Mar. 4, 1952 |