Lady Esther, Ltd., Appellee, v. Lady Esther Corset Shoppe, Inc., Appellant.

Gen. No. 42,258.

452

Opinion filed January 25, 1943.

HYLAND J. PAULLIN, of Chicago, for appellant.

LEDERER, LIVINGSTON, KAHN & ADSIT, of Chicago, for appellee; ARCHIE H. SIEGEL and SIGMUND LIVINGSTON, both of Chicago, of counsel.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

Plaintiff filed its complaint in equity to enjoin defendant from using the name "Lady Esther" or any part thereof, or any other name, designation or combination of words similar to plaintiff's name, and for damages claimed to have been suffered by reason of defendant's acts and practices. The cause was referred to a master in chancery who took the evidence, made up his report and recommended an injunction as prayed for, but that plaintiff was not entitled to any damages. Defendant filed objections to the master's report, they were overruled and ordered to stand as exceptions and after hearing the chancellor sustained the master and entered a decree in plaintiff's favor from which defendant appeals.

The record discloses that Syma Busiel, who is the president and chief stockholder of plaintiff corporation, in 1913 engaged in the cosmetic business in Chicago under the name "Lady Esther." She sold Lady Esther cream and powder going from house to house and later to drug stores in Chicago and vicinity. She made personal appearances in a number of department stores in Chicago where she demonstrated her cream

and powder to prospective customers and in 1921 commenced to advertise. In 1922 she caused the "Lady Esther Company" to be incorporated and its name was later changed to "Lady Esther, Ltd." From 1923 to 1940 plaintiff's expenditures aggregated more than $12,000,000. In 1923 it advertised its products at an expense of $143,000. The advertising was increased each year and in 1936 it expended more than a million and a half dollars. During these years its sales were in excess of $36,000,000. The advertising was carried on by the use of newspapers, magazines and by radio on a nation-wide scale. All of the advertising appeared under the trade name "Lady Esther" and all of its products bore this trade mark.

The master found and was sustained by the chancellor, and defendant does not dispute the finding, that the "trade-mark or trade name, Lady Esther, has become and now is a symbol and name for cosmetics, toilet goods and preparations of high quality and excellence, and the trade-mark or trade name Lady Esther, has become and now is identified with the plaintiff's products, and said designation, Lady Esther, has been, for many years, and now is, known in the City of Chicago, Illinois, and throughout the United States, as belonging to the plaintiff and its predecessors."

Defendant, Lady Esther Corset Shoppe, Inc., was incorporated in 1936, its president was Ben Siegel and his wife, Anna, vice president. He testified that he adopted the name "Lady Esther Corset Shoppe, Inc." because he had a daughter named Esther. Defendant's original place of business was at 810 South Oak Park avenue, Oak Park, and June 1, 1938, it moved to 4150 West Madison street, Chicago, where it has since been located. Prior to the time defendant was incorporated, Ben Siegel owned and operated a similar business at the Oak Park address under the name of Lady Esther Lingerie & Corset Shoppe. In 1932 he went out

of business. Defendant sells at retail exclusively, corsets, brassieres, underwear, hosiery, pocketbooks, gloves, house dresses and other ladies' wearing apparel and costume jewelry doing an annual business of from $13,000 to $14,000. Defendant displayed the name "Lady Esther" on the fringe of its front awning at its place of business in Oak Park and later in Chicago. Some of defendant's packing boxes and bags have on them the name "Lady Esther Corset Shoppe"; the merchandise sold by it bears the name and label of the manufacturers of the merchandise. In the telephone directories its name appeared immediately above that of plaintiff's. Defendant advertises once or twice a month in a local newspaper with a claimed circulation of about 30,000, at an expense of $15 to $20 per advertisement.

It was stipulated by the parties that the "plaintiff does not manufacture, distribute, sell or display brassieres, corsets, ladies' undergarments or merchandise of that sort and that defendant does not handle any products similar to those sold by the plaintiff and that defendant has never handled products similar to those sold or dealt in by the plaintiff."

Counsel for defendant contends that "Illinois adheres to the 'palming off' rule in case of unfair competition. Where there is no competition, there can be no 'palming off.' Since defendant was not in competition with the plaintiff, in any manner whatsoever, plaintiff was not entitled to the injunction prayed for in its complaint." And in support of this four Illinois cases are cited: *Stevens-Davis Co. v. Mather & Co.*, 230 Ill. App. 45; *DeLong Co. v. Hump Hairpin Co.*, 297 Ill. 359; *Johnson Mfg. Co. v. Johnson Skate Co.*, 313 Ill. 106, and *Ambassador Hotel Co. v. Hotel Sherman Co.*, 226 Ill. App. 247. Without stopping to analyze the four cases, we think it sufficient to say that an examination of them discloses the fact that in each there was direct competition between the parties in the

business each was conducting—plaintiff and defendant being engaged in the same line of business—and therefore the "palming off" rule was applicable. The holding in those cases, that where there was direct competition between plaintiff and defendant there must be a "palming off" to warrant relief, is far from saying that courts will not grant injunctive relief where the defendant's conduct is likely to cause confusion of the traders so that the public believes or is likely to believe that the goods of the defendant are the goods of the plaintiff, or that the plaintiff is in some way connected with or is a sponsor of the defendant. In such situation relief will be granted although there is no competition. 38 Harvard Law Review, 370–374; *Eckhart v. Consolidated Milling Co.*, 72 Ill. App. 70; *Aunt Jemima Mills C. v. Rigney & Co.*, 247 Fed. 407; *Ward Baking Co. v. Potter-Wrightington*, 298 Fed. 398; *Vogue Co. v. Thompson-Hudson Co.*, 300 Fed. 509; *Investors' Syndicate v. Hughes*, 378 Ill. 413; *Philadelphia Storage Battery Co. v. Mindlin*, 163 Misc. (N. Y.) 52; *Edison Storage Battery Co. v. Edison Auto Co.*, 67 N. J. Eq. 44.

In 38 Harvard Law Review, 370, in speaking of the necessity for actual competition in cases designated as "unfair competition" the author says: "The truism that law is a developing science is nowhere more strikingly illustrated than in the law of unfair competition. As late as 1742, Lord Hardwicke 'knew of no instance of restraining one trader from making use of the same mark with another.' During the next century the common law of trade-marks took shape. But just as soon as this body of law became reduced to a set of rigid rules, trading pirates adopted many new devices for taking advantage of the good-will of other men's businesses which very cleverly avoided these rules. To protect the honest business man against these impostors equity developed the law of unfair competition.

"But the courts were to a great extent handicapped by the precedents of an era when unregulated competition legalized a very low type of commercial morality. In addition, the usual cases demanding relief under the law of unfair competition in the early days of equity's protection happened to be simple cases of one trader's passing off his own goods as those of a rival, so that 'passing off' would explain practically all the decisions." And the author refers to the *Vogue* case, above cited, as follows: "In the recent case of *Vogue Co. v. Thompson-Hudson Co.,* [300 Fed. 509] however, the Sixth Circuit Court of Appeals squarely repudiated such a doctrine and allowed a fashion magazine an injunction against a hat manufacturer who sought to secure for himself the benefit of the plaintiff's goodwill and reputation in the field of fashion. It is impossible to find any element of competition between the parties, but 'there is no fetish in the word competition: the invocation of equity rests more vitally upon the unfairness.' . . .

"Courts of equity in these unfair competition cases are seeking to protect the good-will and reputation of the plaintiff. Insistence by the courts upon the presence of competition between the parties can only be justified upon a theory that good-will and reputation can only be damaged by competitors. But such a theory is untenable, in the light of human experience. If the defendant's conduct is likely to cause confusion of the traders, so that the public believes or is likely to believe that the goods of the defendant are the goods of the plaintiff or that the plaintiff is in some way connected with or is a sponsor for the defendant, then a sufficient case is made out for injunctive relief. The result of a contrary rule would make the good-will and reputation of the plaintiff depend not only upon the conduct of the plaintiff but also upon the acts of the defendant and the excellence, or, what is more likely, the inferiority, of his products. . . .

"Another change that has come with the realization of this broad basis for 'unfair competition' is the elimination of the requirement of 'fraud.' Although the law of unfair competition has evolved through the application of principles of fraud, with the result that, in this country at least, there will be no relief where the defendant has acted in good faith toward both the plaintiff and the public, yet a realization that the true basis of equity's interference in such cases is not fraud but the protection of good-will has caused many courts to question the propriety of inquiry into the defendant's mental state."

In *Eckhart v. Consolidated Milling Co.*, 72 Ill. App. 70 the defendant was enjoined from using complainant's trade marks in such a manner as probably to deceive customers or patrons; that the motives of the defendant in adopting the trade marks were immaterial and that the piracy would be checked at once by injunction; that it need not appear there was a fraudulent intent of the defendant to dispose of his goods as the goods of plaintiff, or that the public was in-fact misled into purchasing defendant's goods believing them to be those of complainant. The opinion was written by Mr. Justice ADAMS, who cites a number of authorities to support the opinion.

In *Aunt Jemima Mills Co. v. Rigney & Co.*, 247 Fed. 407 plaintiff, by extensive advertising, had created a market for its flour known as "Aunt Jemima" which was sold under that trade mark. Afterward defendant manufactured syrup which it called "Aunt Jemima" and an injunctive relief was granted plaintiff.

In *Ward Baking Co. v. Potter-Wrightington,* 298 Fed. 398 plaintiff was a dealer in flour which it named "Old Grist Mill." Defendant was held to have infringed on plaintiff's trade mark by selling wheat bread which it called "Homespun" in a wrapper with a picture of an old grist mill and in this advertisement used the words "Look for the Old Grist Mill." The

court held the test was whether the similarity of brands would mislead the ordinary observer who usually does not stop to analyze such matters.

In the *Vogue* case, 300 Fed. 509 plaintiff published a magazine known as "Vogue" which became an authority on styles for women. Defendant was enjoined from using the name "Vogue" in connection with the sale of hats.

Our Supreme Court cites the *Vogue, Aunt Jemima* and *Ward Baking Co.* cases with approval in *Investors' Syndicate v. Hughes,* 378 Ill. 413 where Mr. Justice STONE in speaking for the court said, (p. 422): "Plaintiff cites numerous cases where the courts have refused to consider the question of fraud or imposition on the public, in controversies between hostile corporations over the use of a name. In such cases it has been held that the injunctive relief sought was based upon the protection of property rights of the plaintiff, and that an injunction will not issue unless it is made to appear that the proposed use of the name will result in injury to the complainant. [Citing 3 Illinois cases.] Even in injunction cases between competing corporations the trend of decision is to place less emphasis on competition and more on confusion, as is evidenced by the following cases: *Vogue Co. v. Thompson-Hudson Co.,* 300 Fed. 509, *Aunt Jemima Mills Co. v. Rigney & Co.,* 247 Fed. 407. As was said in *Ward Baking Co. v. Potter-Wrightington,* 298 Fed. 398, 'The test should be whether the public is likely to be deceived.'"

A great many other authorities are cited in plaintiff's brief where the same rule is followed. Derenberg on Trade Marks Protection and Unfair Trade, is also cited, where the author in referring to the *Vogue* case says (p. 423): "With this decision the law of unfair competition was freed of one of its heaviest chains. Any attempt to capitalize on the reputation or good will of another is declared unfair trade and

therefore unlawful, even in the absence of 'passing off' or 'competition' in the literal sense of the word."

In the instant case we think it clear that the public might be deceived into thinking there was some connection between the defendant and the plaintiff companies. And the good-will of plaintiff, which it had built up at great expense over a period of years, would be whittled away. Courts of equity ought not to be so feeble as to be unable to prevent this. And the fact that defendant received a charter to use the name "Lady Esther Corset Shoppe, Inc." does not protect it. Par. 157.9, sec. 9, ch. 32, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 32.009]; *Investors' Syndicate v. Hughes,* 378 Ill. 413. The writ of injunction issued in the instant case to protect plaintiff's trade name, "Lady Esther" is in harmony with the holdings of 7 other cases cited by counsel for plaintiff in their brief where plaintiff, "Lady Esther" was awarded an injunction against the defendants from selling hosiery, women's clothing, jewelry and gloves under the trade name "Lady Esther."

The decree of the superior court of Cook county is affirmed.

*Affirmed.*

MATCHETT, P. J., and McSURELY, J., concur.