SPANGLER CANDY COMPANY, an Ohio corporation, Plaintiff,

v.

CRYSTAL PURE CANDY COMPANY, a partnership, Defendant.

No. 61 C 12.

United States District Court
N. D. Illinois, E. D.

Oct. 9, 1964.

G. B. Christensen and Bruce L. Bower, Winston, Strawn, Smith & Patterson, Chicago, Ill., for plaintiff.

Dean A. Olds, Jerome Gilson and James B. Blanchard, Hume, Groen, Clement & Hume, Chicago, Ill., for defendant.

DECKER, District Judge.

This is a suit brought by Spangler Candy Company (Spangler), plaintiff, against Crystal Pure Candy Company (Crystal), defendant, for trademark infringement and unfair competition. The defendant has counterclaimed for damages resulting from alleged unfair competition on account of news stories caused to be published by the plaintiff in trade journals and statements to defendant's customers by plaintiff's representatives concerning the subject matter of the plaintiff's suit.

Spangler is an Ohio corporation with its principal place of business in Bryan, Ohio. Crystal is a partnership with partners residing in the states of Illinois and New York and having a principal place of business at Chicago, Illinois.

This Court finds that there is diversity of citizenship between the plaintiff and all of the partners of the defendant partnership and that the amount in controversy, exclusive of interest and costs, exceeds the sum of $10,000.

Plaintiff and defendant both assert claims arising under state unfair competition law and the trademark statute (15 U.S.C. §§ 1051–1127). This Court has jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332 and 1338.

Pursuant to Rule 21 of this Court, the issue of liability under the allegations contained in the complaint and counterclaim was separated from the issue of damages, and a separate trial was ordered upon the issue of liability under the allegations contained in the complaint and upon the issues raised by the counterclaim and the answer thereto.

### Plaintiff's Complaint for Trademark Infringement and Unfair Competition

Both plaintiff and defendant manufacture lollipops.[1] The gist of Spangler's complaint is that it had been packaging small lollipops, individually wrapped in white wax paper, about 30 to the package, in a clear polyethylene bag with its trademark and certain other words printed in a certain pattern with certain colors; that they had been doing this since 1957; that this system of marketing was well established and well known to the trade by 1959; that in April, 1960, Crystal began packaging lollipops in a similar manner using the same colors and many of the same phrases on their bag. Spangler specifically contends that their registered trademark "Dum-Dums" (printed in the style described below) was infringed by Crystal's registered trademark "Pop-Pops." Spangler further contends that Crystal's use of a similar bag with similar colors and writings, either in conjunction with the defendant's trademark, or as an independent collocation, constitutes unfair competition.

Plaintiff alleges that defendant did this with the intent to infringe and with the intent to compete unfairly and with the intent to palm off defendant's product as plaintiff's.

Plaintiff requests injunctive relief, an accounting and damages.

In addition to the jurisdictional facts noted above, this Court makes the following Findings of Fact:

1. Plaintiff is engaged in the manufacture and sale of suckers in interstate commerce under the registered trademark "Dum-Dums."

---

1. Lollipops, often referred to by their consumers and by the trade as "suckers," are a hard candy made in various flavors and molded on the end of a stick made of wood or strongly compressed paper.

The plaintiff also produces other kinds of candy, but the defendant produces only a variety of lollipops; only the lollipops of a certain kind are involved in this action.

2. Plaintiff acquired the "Dum-Dums" business and trademark from the Akron Candy Company in 1953.

3. Akron and its predecessors used the trademark in connection with the manufacture and sale of lollipops in interstate commerce continuously since its date of first use, February 1, 1924.

4. The trademark "Dum-Dums" is validly registered and all the necessary procedural steps for its transfer to Spangler have been followed.

5. Plaintiff's trademark "Dum-Dums" is printed with the word "Dum" on an upper line and with the letters in descending size followed by a cuneiform dash and a lower line consisting of the word "Dums" with the letters in ascending size.

6. Spangler has continuously engaged in the manufacture and sale of lollipops under the trademark of "Dum-Dums" in interstate commerce since the transfer in 1953.

7. Plaintiff markets its "Dum-Dums" suckers in a variety of packages, including clear polyethylene or plastic bags, cardboard cartons, and bulk containers.

8. The 29¢ polyethylene bags are sold to supermarkets and comprise 50% of the "Dum-Dums" business.

9. Since 1954 plaintiff has used a clear polyethylene bag containing 29 or 30 individually wrapped suckers, weighing about ten ounces.

10. Imprinted on the polyethylene bag were the trademark "Dum-Dums" and the plaintiff's trade name Spangler Candy Company with the address Bryan, Ohio.

11. Also imprinted on the plaintiff's polyethylene bag were designs of red and blue balloons and a yellow flag or pennant upon which was printed the plaintiff's trademark; in association with these designs were illustrations of a cowboy and of a small girl pulling the balloons.

12. On the plaintiff's bags are also printed "Save Dum-Dums Wrappers," and "The World's Best Pop."

13. The suckers in plaintiff's bag are ball shaped with a band running around the mid-portion of the sucker and with one side of the sucker round and the other slightly flattened.

14. Plaintiff's suckers are wrapped individually in whitish wax paper; the wax wrappers have had various different styles of bands of color applied to them in which the color and a picture of the fruit indicated the flavor of the sucker, such as red with a picture of a cherry for cherry flavor.

15. Plaintiff's bag is sold at retail for 29¢.

16. Plaintiff has used the same 29¢ supermarket bag continuously since 1956 with the exception of certain minor variations resulting from printing errors or changes in weight; at Halloween time removable seasonable streamers were attached.

17. Plaintiff has spent less than $1,000. advertising its product to the public.

18. Defendant has marketed candy in the United States for many years, and, since 1947, has specialized entirely in the sale of suckers through grocery stores, drug stores and supermarket chains.

19. Defendant registered its trade name "Pop-Pops" in the United States Patent Office on October 2, 1962.

20. Initially the "Pop-Pops" trademark on the wax wrapper was printed with the word "Pop" on an upper line and with the letters in descending size, followed by a cuneiform dash and a lower line consisting of the word "Pops" in ascending size.

21. Shortly after the suit was started, Crystal began printing its trademark on the wax wrappers horizontally.

22. In 1959 defendant's managing partner, Arthur Abbey, designed a new package format for suckers which were to be sold under the trademark "Pop-Pops;" at the time that Abbey designed the defendant's package and sucker wrapper, he had before him a variety of competitors' packages, including one of the plaintiff's "Dum-Dums" packages.

23. Abbey designed a package to approximate the format of Spangler's package; he admitted he attempted to get "as close to it without copying it" as he could (Record p. 713).

24. Defendant's lollipop is the same shape as plaintiff's lollipop.

25. Defendant's bag consisted of clear polyethylene with "Pop-Pops" printed on it as well as the defendant's trade name, Crystal Pure Candy Company, Chicago, Illinois.

26. The design elements on defendant's package consist of triangles in the colors of red, yellow and blue.

27. The "Pop-Pops" trademark was printed with letters of equal size.

28. The defendant's bag also has the words "Save Wraps for Prizes," "with paper safety sticks," and "America's best pop!" printed on it.

29. Defendant has been using the same package, with the exception of the above-mentioned change in the wax wrappers, since April, 1960.

30. Evidence shows that other candy manufacturers have used polyethylene bags and other candy manufacturers have used wax wrappers for lollipops.

31. Evidence shows that this product is bought primarily on the basis of cost to the merchant, not on the basis of a demand for "Dum-Dums" or "Pop-Pops." They are considered to be "substitutes."

32. Plaintiff and defendant utilized the same premium house in Chicago for almost one year; upon the plaintiff's inquiry, the premium house stated that "Pop-Pops wrappers were never sent in for Dum-Dum premiums or vice versa."

### Trademark Infringement

Plaintiff complains that the defendant has violated the Lanham Act, 15 U.S.C. § 1114, by its adoption of the name in issue. The statute provides, in part:

"Any person who shall, without the consent of the registrant—

"(a) use in commerce any * * * copy or colorable imitation of a registered mark in connection with the sale * * * of any goods * * * on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; * * *

\*　　\*　　\*　　\*　　\*

shall be liable * * *."

The phrase "colorable imitation" is defined as follows by 15 U.S.C. § 1127:

"The term 'colorable imitation' includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive."

■■ A registered trademark is to be protected if another uses the same form, spelling or sound in such a way that confusion is likely to result in the minds of the ordinary consumer. As the Court said in Independent Nail & Packing Co. v. Stronghold Screw Products, Inc., 205 F.2d 921 (7th Cir. 1953):

"'[I]t is sufficient if one adopts a trade-name or a trade-mark so like another in form, spelling, or sound that one, with a not very definite or clear recollection as to the real trade-mark, is likely to become confused or misled.' Northam-Warren Corp. v. Universal Cosmetic Co., 7 Cir., 18 F.2d 774, 775." (Ibid. at p. 924)

■ The proper comparison must be made under the conditions of the market place. Square D Co. v. Sorenson, 224 F.2d 61, 64 (7th Cir. 1955). Products which are not sold side by side must not be compared side by side, Independent Nail & Packing Co. v. Stronghold Screw Products, Inc., supra; Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385 (7th Cir. 1959), but must be seen as the consumer sees them.

■ When products are sold by name, over a counter, the sound of the name is most important, see e. g., Searle & Co. v. Chas. Pfizer & Co., supra. When products are sold in self-service markets, then the visual impression of the trademark, as well as the sound of the words, is important.

■ A manufacturer adopting a mark must take care to see that his mark is

clearly distinguishable from those marks already in use; if the same product is sold by both, the competing mark must be more clearly distinguishable. However, the new entrant is not an insurer of the prior user's trademark. Life Savers Corp. v. Curtiss Candy Co., 182 F.2d 4 (7th Cir. 1950).

If the second mark would not confuse the purchaser who had some recollection of the first mark, then there is no infringement.

In this case, the plaintiff contends that its mark, Dum-Dums, printed as described in Finding of Fact 5, is infringed by defendant's mark, Pop-Pops, printed as described in Finding 20. Examining the words, the only similarity between the two phrases is that they each contain two short words with the same number of letters, broken with a dash at the same place. The meaning of Dum-Dums, as applied in this instance is fanciful, not descriptive; on the other hand, Pop-Pops may be considered descriptive of a branch of the lollipop family.

The sound of these words is different, in contrast to the words "Dramamine" and "Bonamine" which were held to infringe in the Searle case, supra. See also, Nokes v. Mueller, 72 Ill.App. 431 (1897) ("Walnut Park Dairy" and "Walnut Grove Dairy"); Hershel California Fruit Products Co. v. Contadina Brokerage & Distributing Co., 292 Ill.App. 158, 10 N.E.2d 720 (1937) ("Contadina" and "Signorina").

Although both the plaintiff and the defendant utilized the same premium house for almost a year, there was no confusion on the part of the customers as to whether they were sending wrappers from "Dum-Dums" or from "Pop-Pops." The wrappers of one were never sent in for a premium offered by the other. (See Finding of Fact No. 32.)

Plaintiff also contends that the triangular form in which its trademark is printed was copied by the defendant and thereby the plaintiff's mark was infringed. But the plaintiff's mark cannot be dissected; it must be viewed as a whole. National Van Lines, Inc. v. Dean, 288 F.2d 5, 10 (7th Cir. 1961).

In regard to plaintiff's cause of action based upon the Federal trademark act, I draw the following conclusions of law:

1. The defendant's mark does not so resemble the plaintiff's mark as to be likely to confuse or to deceive purchasers.

■ 2. The trademark "Pop-Pops" does not infringe the trademark "Dum-Dums."

■ The plaintiff also contends that the defendant's trademark violates the Illinois trademark laws, specifically ch. 140, § 22, Ill.Rev.Stat., which provides:

"Every person  *  *  *  adopting and using a mark, trade name, label or form of advertisement may proceed by suit  *  *  *  to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, trade name, label, or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services;  *  *  *."

■ The anti-dilution provision only adds to the plaintiff's rights under prior law when the parties are not in actual competition. If the parties conduct their affairs in different lines of commerce, adoption by one of a name similar to that in use by the other will not ordinarily cause confusion. Nevertheless, the courts hold that if the name originated with the plaintiff, and is distinctive, then the plaintiff is entitled to some property right in the continued use of the name, irrespective of any failure to show that the public associates the product with the plaintiff. Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830 (7th Cir. 1963).

As discussed above, the names used by the parties to this action are not similar; therefore, the Illinois statute affords the plaintiff no additional relief.

### Unfair Competition

▮ Although this Court does not find that the plaintiff's trademark has been infringed, it may still find that the defendant is liable on the basis of unfair competition. Since there is diversity of citizenship, the jurisdictional provisions of 28 U.S.C. § 1332 are met; see also the pendant jurisdiction provisions of 28 U.S.C. § 1338(b).

▮ Unfair competition, regardless of trademark infringement, is regulated by state law. Independent Nail & Packing Co. v. Stronghold Screw Products, Inc., 205 F.2d 921, at 926 (7th Cir. 1953). But see, L'Aiglon Apparel v. Lana Lobell, 214 F.2d 649 (3d Cir. 1954). In this case, Illinois law applies. Addressograph-Multigraph Corp. v. American Expansion Bolt & Mfg. Co., 124 F.2d 706 (7th Cir. 1941).

The Supreme Court recently had occasion to examine the Illinois law of unfair competition. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), was disposed of upon the ground that Illinois law, if it were as construed by the Seventh Circuit, would conflict with Federal patent law; however, the Court, in a footnote, said the following (376 U.S. at pp. 227–228, 84 S.Ct. at p. 787):

> "At least one Illinois case has held in an exhaustive opinion that unfair competition under the law of Illinois is not proved unless the defendant is shown to have 'palmed off' the article which he sells as that of another seller; the court there said that '[t]he courts in this State do not treat the "palming off" doctrine as merely the designation of a typical class of cases of unfair competition, but they announce it as the rule of law itself—the test by which it is determined whether a given state of facts constitutes unfair competition as a matter of law. * * * The "palming off" rule is expressed in a positive, concrete form which will not admit of "broadening" or "widening" by any proper judicial

process.' Stevens-Davis Co. v. Mather & Co., 230 Ill.App. 45, 65–66 (1923). In spite of this the Court of Appeals in its opinions both in this case and in Day-Brite Lighting, Inc. v. Compco Corp., 7 Cir., 311 F.2d 26, rev'd, 376 U.S. 234, 84 S.Ct. 779, relied upon one of its previous decisions in a trade-name case, Independent Nail & Packing Co. v. Stronghold Screw Prods., 205 F.2d 921 (C.A.7th Cir. 1953), which concluded that as to use of trade names the Stevens-Davis rule had been overruled by two subsequent Illinois decisions. Those two cases, however, discussed only misleading use of trade names, not copying of articles of trade. One prohibited the use of a name so similar to that of another seller as to deceive or confuse customers, even though the defendant company did not sell the same products as the plaintiff and so in one sense could not be said to have palmed off its goods as those of a competitor, since the plaintiff was not a competitor. Lady Esther, Ltd., v. Lady Esther Corset Shoppe, Inc., 317 Ill.App. 451, 46 N.E.2d 165, 148 A.L.R. 6 (1943). The other Illinois case on which the Court of Appeals relied was a mandamus action which held that under an Illinois statute a corporation was properly denied registration in the State when its name was 'deceptively similar' to that of a corporation already registered. Investors Syndicate of America, Inc., v. Hughes, 378 Ill. 413, 38 N.E.2d 754 (1941). The Court of Appeals, by holding that because Illinois forbids misleading use of trade names it also forbids as unfair competition the mere copying of an article of trade without any palming off, thus appears to have extended greatly the scope of the Illinois law of unfair competition beyond the limits indicated in the Illinois cases and beyond any previous decisions of the Seventh Circuit itself. Be-

cause of our disposition of these cases we need not decide whether it was correct in doing so."

I shall now turn to look at the limits which the Illinois courts have set for the doctrine of unfair competition in this state. In 1923, the Illinois law of unfair competition was discussed, consolidated and expounded by Mr. Justice Johnston in an exhaustive opinion, Stevens-Davis Co. v. Mather & Co., 230 Ill.App. 45 (1923). He stated (at pp. 65–66):

"The courts in this State do not treat the 'palming off' doctrine as merely the designation of a typical class of cases of unfair competition, but they announce it as the rule of law itself—the test by which it is determined whether a given state of facts constitutes unfair competition as a matter of law. As the Supreme Court of this State said in the case of DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co., supra, quoting from the Supreme Court of the United States in the case of Howe Scale Co. v. Wyckoff, Seamans & Benedict, supra: 'If defendant so conducts its business as not to palm off its goods as those of complainant, *the action fails.*' We are of the opinion from our examination of the authorities, that the 'palming off' doctrine has been followed by both the state and federal courts in an almost unbroken line of decisions, as a rule of law, and that the courts of this state also deem it to be a rule of law." (Emphasis in original.)

The rule in the Stevens-Davis case has been followed by the state courts and the federal courts where the two parties were in direct competition. Soft-Lite Lens Co. v. Ritholz, 301 Ill.App. 100, 105–106, 21 N.E.2d 835 (1939); Addressograph-Multigraph Corp. v. American Expansion Bolt & Mfg. Co., 124 F.2d 706 (7th Cir. 1941); National Nut Co. v. Kelling Nut Co., 61 F.Supp. 76 (N.D.Ill.1945).

It is important to distinguish a branch which has grown from the tree of the Illinois unfair competition law. An exception is made to the palming off doctrine when the names of two organizations *not* in competition were the same or similar. In Lady Esther, Ltd. v. Lady Esther Corset Shoppe, 317 Ill.App. 451, 46 N.E.2d 165, 148 A.L.R. 6 (1943), the Court distinguished cases such as Stevens-Davis, supra, where the parties were in direct competition so that the palming off rule could function satisfactorily to protect the public from deception, from cases where the same or similar names were used to sell dissimilar products; in these latter cases, the likelihood of confusion due to the similar names was sufficient to cause concern for the protection of the public.

As Judge LaBuy said:

"This is an extension of the rule to include non-competing parties within the unfair trade rule. But where there is competition between the parties as in the present case, the most that can be said is that there must be a confusion of the plaintiff's goods with those of the defendants' in the eyes of the public, and that constitutes no variation of the 'palming off' doctrine." National Nut Co. v. Kelling Nut Co., supra, 61 F.Supp. at 85.

Independent Nail & Packing Co. v. Stronghold Screw Products, supra, stated this exception to the rule in such a way that it could have been considered to hold a modification of the rule which will apply to all unfair competition cases. This case, a name similarity case, is not authority for extending the holding in Lady Esther, supra, beyond name cases and into cases of similar product or similar packaging.

The parties have cited other cases which are not helpful because they refer to similarity of names. HMH Publishing Co. v. Playboy Records, 161 F.Supp. 540 (N.D.Ill.1958); Wembley, Inc. v. Diplomat Tie Co., 216 F.Supp. 565 (D. Md.1963); Square D Co. v. Sorenson, 224 F.2d 61 (7th Cir. 1955).

At this point it would be well to restate the contentions advanced by the plaintiff in this action. Plaintiff contends that the defendant has copied substantially the makeup of its package, that is, the same shaped lollipops, individually wrapped in white wax paper with printing on each wrapper in an ink color which indicates the flavor of the pop; that the same number of pops is packaged in the same sized polyethylene bag with printing in the same colors. Plaintiff argues that this similarity confuses the customer so that he will be tricked into buying the defendant's package thinking that it is the plaintiff's package; furthermore, the plaintiff contends that it has acquired certain rights to the exclusive use of the packaging collocation through prior use. It must be remembered that the plaintiff has neither design patent nor copyright, nor design registered as a distinctive mark in addition to its registered trademark, "Dum-Dums" described above.

There is no doubt that the packages of the parties to this action are similar. Nevertheless, each package is clearly marked with the brand name and with the name of the manufacturer. The names can be read, and the packages thereby distinguished, from several feet away.

The problem before the Court can now be summarized as this: The packages of both the parties are clearly marked with trademark, name and address. Any consumer who cared to buy the product of the plaintiff specifically, could ascertain the brand and manufacturer from a quick glance at the package; however, the evidence shows, and plaintiff admits, that these lollipops are bought on "impulse," that is, a lagniappe picked up by the shopper who did not travel to the store to purchase lollipops, but to buy staples for the family larder.

According to the evidence, lollipops are usually displayed with the other candy in the supermarket; in fact, one type of candy will probably always be in the same place. If the shopper is used to picking up lollipops from one spot on the shelf, she will probably continue to pick up whatever lollipops are there and are the same as, or similar to, those which she picked up last week. The impulse buyer is very much attracted by the design and color of the package; the more eye-catching the package, the more the product sells.

The questions which this Court must now decide are: (a) Does the plaintiff have a property right to the package design and its coloration which is neither patented, copyrighted nor trademarked, so that it can prevent the defendant from copying those features on the basis of that right? (b) Is the customer who purchases a product on the basis of its package design and contents but who does not distinguish different brands "deceived?" (c) And did the customers of the plaintiff come to associate the plaintiff's package design and coloration with the plaintiff, so that the package has acquired a secondary meaning and so that the defendant's similar package would deceive the customer, making him think that the product was the plaintiff's?

(a) The property right of the plaintiff. The Supreme Court has recently handed down decisions concerning an analogous area, protection of an unpatentable design. In Sears, Roebuck and Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L. Ed.2d 661 (1964), the plaintiff manufactured a distinctive kind of lamp called a "pole lamp." The defendant, Sears, copied the lamp exactly and sold it at a lesser price. Reversing the Court of Appeals, which had affirmed the District Court's finding for the plaintiff, the Supreme Court wrote:

> "What Sears did was to copy Stiffel's design and to sell lamps almost identical to those sold by Stiffel. This it had every right to do under the federal patent laws. That Stiffel originated the pole lamp and made it popular is immaterial.
>
> \*    \*    \*    \*    \*    \*
>
> "To allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be

patented would be to permit the State to block off from the public something which federal law has said belongs to the public." (At pp. 231–232, 84 S.Ct. at p. 789.)

The Court, in dictum, also considered the labeling of goods (at page 232, 84 S.Ct. at page 789):

"Doubtless a State may, in appropriate circumstances, require that goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source, just as it may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from *misleading purchasers* as to the source of the goods." (Emphasis added.)

■ The emphasis of this quotation is that the only interest that the state may protect, without infringing upon the powers granted by the constitution and federal laws to the national government, is that of protecting the customers from deception.

I do not read Sears as being on all fours with the case at bar, since I consider that the proper analogy is to the components which the plaintiff uses, the lollipops, the wax wrappers, the color, the polyethylene bags and the designs and printing. Nevertheless, Sears indicates, and the dictum quoted above confirms, that the only interest which the manufacturer can claim, in the absence of a valid trademark, patent or copyright, is to protect his customer from being deceived by a competitor.

But it is not necessary to rest this decision solely upon Sears. The plaintiff has not shown that it originated any of the components of its packaging; it could not show appropriation by prior use (see Finding of Fact No. 30). Furthermore, the common law of Illinois does not protect the interest of a manufacturer who happened to first sell a product. "Palming off" is required as the basis for an injunction. Many cases have held that a product unprotected by a valid statute may be copied by anyone. See Stevens-Davis Co. v. Mather & Co., 230 Ill.App. 45 (1923); Addressograph-Multigraph Corp. v. American Expansion Bolt & Mfg. Co., 124 F.2d 706 (7th Cir. 1941); Duralastic Lamp Products, Inc. v. Meyerowitz, 139 U.S.P.Q. 354 (N.D.Ill.1963).

■ From this I draw the following conclusion of law:

3. That the plaintiff's package format is not entitled to protection without a showing of palming off.

■ (b) The next question is whether the customer is likely to be confused or deceived by similar packages when the packages are clearly marked with the manufacturer's trademark and name. Confusion is defined as: "To mix or blend so that things cannot be distinguished." The import of confusion is that the consumer must have something in mind, even though it is somewhat vague, with which to confuse another product.

Unless the package collocation has acquired a secondary meaning, to be discussed below, the plaintiff is faced with what has been called "buyer indifference." See Stern, Buyer Indifference and Secondary Meaning in Unfair Competition and Trademark Cases, 32 Conn.B.J. 381 (1958). The buyer, to be deceived, must be looking for something. As the District Court stated, applying the California unfair competition law, which is similar to that of Illinois, to labels of cans from competing can makers:

"An examination of the *tout ensemble* of the labels on cans that have been pointed to as the most likely to cause confusion * * * show[s] such deviation in pattern, description and arrangement that it is unlikely that a person looking for the Chun King brand would pick up the can distinctly marked Jan-U-Wine which is the defendant's brand. There is no attempt to imitate the script. Even the height of the cans is not the same. Indeed, while the two colors are yellow and red, the

shades are different. A casual buyer who *did not buy* by the brand might pick up one can for the other. But in that case, he is *not* the plaintiff's *prospective* customer. On the contrary, he is in the market for *Chinese food* and his selection of one in preference to the other does not involve the *type of choice* as to which the law is anxious to avoid confusing deception." Chun King Sales v. Oriental Foods, 136 F.Supp. 659, 664–665 (S.D.Cal.1955) (Yankwich, Chief Judge). (Emphasis in original.)

Another case in point was cited by the defendant. In Gum, Inc. v. Gumakers of America, Inc., 136 F.2d 957 (3d Cir. 1943), the plaintiff, whose brand name was "Blony," complained that the defendant, whose trademark was "Bubly," was using a substantially identical wrapper for its bubble gum, including the same colors. Judge Maris stated, at page 958:

"[A]ny one has the right to manufacture and sell a product similar or even identical in appearance to the original product with which it competes unless the original product has become associated in the public mind with its producer."

Although this case may be somewhat too broad in scope, because it would equate copying the product with copying the package, it can be read to mean that, unless the package has acquired secondary meaning, the competitor is free to copy the package provided he clearly marks it as his own so that any consumer who cared could ascertain the difference.

See also, Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938); Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299 (2d Cir. 1917); Sinko v. Snow-Craggs Corporation, 105 F.2d 450 (7th Cir. 1939); Tas-T-Nut Co. v. Variety Nut and Date Co., 245 F.2d 3 (6th Cir. 1957); Case Note, Unfair Competition—Imitation of Package Held to be Unfair Competition, 1957 Ill.L.Forum 677; Developments,—Competitive Torts, 77 Harv.L.Rev. 888, 908–918 (1964).

Many cases have been cited which are inapplicable to this fact situation. In Life Savers Corp. v. Curtiss Candy Co., 182 F.2d 4 (7th Cir. 1950), the plaintiff had registered "Life Savers" and a background of the color of the candy contained (multicolored for the five-flavor pack) as a distinctive mark; the defendant used the same backgrounds for its candy in a similar package, with its name clearly on the package. The Court said at page 7:

"The color of the background is in fact descriptive and serves as a ready identification of the flavor of the candy in the package. * * * It has long been common practice in the packaging art for the label of a package, can, or other container, to show a colored replica of the contents."

This case applies as far as the coloration of the wrappings of the lollipops which are printed in colors to indicate the flavor of the candy contained. The case does not indicate what should be done about arbitrary colors nor about a combination of many similar features.

In Campbell Soup Co. v. Armour & Co., 175 F.2d 795 (3d Cir. 1949), the plaintiff contended that, because it had trademarked a label one-half white and one-half red, it was entitled to have the color scheme protected. The Court said at page 798:

"What the plaintiffs are really asking for, then, is a right to the exclusive use of labels which are half red and half white for food products. If they may thus monopolize red in all of its shades the next manufacturer may monopolize orange in all its shades and the next yellow in the same way. Obviously, the list of colors will soon run out."

In the case at bar the plaintiff has not registered *any* color with the trademark.

Other cases have found unfair competition when a very similar name was chosen by the defendant, and was placed on a package or sign almost identical to the plaintiff's package or sign; the result

was that even the customer who took the trouble to glance at the name would be confused, unless he studied it very closely. In Hershel California Fruit Products Co. v. Contadina Brokerage & Distributing Co., 292 Ill.App. 158, 165, 10 N.E.2d 720, 722–723 (1937), where the plaintiff used the name "Contadina" and the defendant used "Signorina," the Court said:

> "The label used by plaintiff in the marking of its product, and the two labels adopted by defendants, are so similar in every respect, except as to slight details, that anyone purchasing defendants' product, with these labels attached thereto, might very easily be misled, and assume that the product was that of the plaintiff corporation."

See also, Nokes v. Mueller, 72 Ill.App. 431 (1897), (similar pictures of the parties' delivery trucks, combined with the names "Walnut Grove Dairy" or "Walnut Park Dairy"); National Van Lines v. Dean, 237 F.2d 688, 692 (9th Cir. 1956), ("National Van Lines" upon a shield with stripes and "National Transfer & Storage" on a map of the United States with identical stripes); O'Sullivan Rubber Co., Inc. v. Genuine Rubber Co., 279 F. 972 (1st Cir. 1922), ("O'Sullivan's Safety Cushion Heel" and "The Genuine Safety Cushion Heel," printed on identical boxes).

From this discussion, I draw the following conclusion of law:

4. Unless the plaintiff's package has come to indicate a source to the consumer, that is, has acquired a secondary meaning, the similarity of the defendant's package is an insufficient basis for making a finding of "palming off."

(c) The final point is whether, after Sears, and in light of Illinois law, the doctrine of secondary meaning can protect an unpatented, uncopyrighted and untrademarked package from a similar package distributed by a competitor. A recent law review article stated:

> "The tort of passing off by product simulation, though not in conflict

with the law of trademarks, might be thought an unnecessary addition. The originator's goods typically will be trademarked and so distinguishable from goods similar in shape. And even if the original manufacturer's trademark furnishes insufficient protection against consumer confusion, one remedy in the law of product simulation has been to require that the imitation bear a trademark or other notification differentiating it from the original. However, modern visual methods of advertising together with self-service merchandising suggest that trademarks alone will provide incomplete protection in some cases.

> "The central role of the recognitional interest in product simulation is reflected in the elements of the tort. As in trademark law, the copied features must be sufficiently similar to create a likelihood of consumer confusion. In addition, adopting a term of art from the law of non-technical—geographical or descriptive—trademarks, courts have required that the copied features have 'secondary meaning'; copying will be enjoined only if the public associates the copied features with a particular source and, under some formulations, only if this source association motivates the public to buy this product rather than another." Developments—Competitive Torts, 77 Harv.L.Rev. 888, 910.

Plaintiff reads Sears as applying very narrowly, only to prevent prohibition of copying the product, the lollipop, itself; defendant would interpret Sears very broadly as applying to copying anything, including packaging, even though similar packages might be likely to deceive the consumer as to source.

This Court does not feel that, as applied to simulation of a competitor's packaging, the Sears decision prevents an injunction from being issued. Sears indicates that the property interests of the first entrant cannot be protected as property interests unless they are regis-

tered and afforded protection by the federal statute which has pre-empted the field. However, the manufacturer can come to court on behalf of his customers who have become attached to a certain form of packaging so that if another were to copy that format, the customer would be deceived. This is protection for the customer.

Although the cases which protected products that had acquired secondary meaning can no longer be used to protect the manufacturer from a second manufacturer copying the product, the tests used in those cases are still valid to help the court determine whether the packaging of identical goods will deceive the consumer. The package of the goods is not the goods themselves. Judge Learned Hand stated in Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299, 300 (2d Cir. 1917):

> "The cases of so-called 'nonfunctional' unfair competition, * * * are only instances of the doctrine of 'secondary' meaning. All of them presuppose that the appearance of the article, like its descriptive title in true cases of 'secondary' meaning, has become associated in the public mind with the first comer as manufacturer or source, and, if a second comer imitates the article exactly, that the public will believe his goods have come from the first, and will buy, in part, at least, because of that deception. Therefore it is apparent that it is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has in fact come to mean that some particular person —the plaintiff may not be individually known—makes them, and that the public cares who does make them, and not merely for their appearance and structure."

Many of the cases cited by the plaintiff involve secondary meaning. In Nokes v. Mueller, supra, the plaintiff had been using the same name and wagons with the same decoration for sixteen years; when the defendants used wagons painted with similar pictures and a similar name, it is easy to see that the consumer, long accustomed to seeing the plaintiff's wagons, would not, and could not, be expected to take the care to read the writing in more than a cursory manner. One does not question the authenticity of the familiar. In Globe-Wernicke Co. v. Brown & Besly, 121 F. 90 (7th Cir. 1902), and in Hershel California Fruit Products Co. v. Contadina Brokerage & Distributing Co., 292 Ill.App. 158, 162, 10 N.E.2d 720 (1937), there was evidence of the plaintiff's long established use.

Another case determined that the competitor's subsequent package was very similar to a prior one which had acquired a special meaning for the customer; in these circumstances the second package did deceive the customer. Tas-T-Nut Co. v. Variety Nut & Date Co., 245 F.2d 3, 7 (6th Cir. 1957).

Defendant has not counterfeited the package of the plaintiff's product, but has only adopted the plaintiff's format. Defendant's admission that it attempted to get as close to the plaintiff's bag (Finding No. 23) as it could is only an admission as to format; I do not read this as an admission that defendant intended to copy the bag so as to palm off its product. There is no evidence from disinterested witnesses that the plaintiff's bag has come to be associated with a certain source. Furthermore, disinterested buyers for supermarkets testified, with one exception, that they bought the product solely by the wholesale price (Finding No. 31). As they stated, the items were substitutes. This indicates to me that there was no consumer demand for either "Pop-Pops" or "Dum-Dums" but only a demand for penny lollipops wrapped individually in wax paper and sold in a polyethylene bag.

■■■ Therefore, I draw the following conclusions:

5. No secondary meaning has been shown by the plaintiff.

6. That consumers intending to buy "Dum-Dums" have not been deceived by

the "Pop-Pops" format; in this situation, there has been no "palming off."

Under these circumstances, plaintiff is not entitled to relief, and the complaint must be dismissed.

### Counterclaim of Defendant for Trade Libel and Slander

Defendant claims that it was damaged because the plaintiff (a) caused articles describing the suit to be published in sixteen trade journals upon the filing of suit; (b) caused its salesmen to approach customers of the defendant and to make comments regarding the suit, including "threats" that the customers might be called as witnesses or might be made co-defendants' and (c) issued a press release immediately preceding a national convention of customers which allegedly misrepresented a court ruling during the pendency of the suit.

### Findings of Fact

1. Simultaneously with the filing of the complaint in January of 1961, Spangler issued the following press release to sixteen trade journals:

"Spangler Candy Company of Bryan, Ohio, has filed an unfair competition and trademark violation suit in the Federal Court at Chicago against Crystal Pure Candy Company alleging that the latter has used illegal methods in competing with Spangler's popular lollipop, 'DUM-DUMS'.

"Spangler alleges that it developed a unique method of marketing 'DUM-DUMS' through the use of distinctive size and shape of product, labels, methods of packaging, and offers of premiums. Spangler further alleges that since 1959 or early 1960 Crystal Pure Candy Company has pursued a plan of unfair competition by so simulating plaintiff's product, labels and method of merchandising as to confuse buyers into believing they are purchasing Spangler's products when actually they are purchasing Crystal Pure's. The suit points out that Spangler has a registered trademark, 'DUM-DUMS' and that Crys-

tal Pure has brought out a competing lollipop which it calls 'POP-POPS' with the name 'POP-POPS' printed in a style precisely similar to that used by Spangler in printing 'DUM-DUMS'.

"Harlan G. Spangler, Treasurer of Spangler Candy Company, says, 'We are not averse to proper competition. However, we have been advised that the methods recently pursued by Crystal Pure Candy Company in trying to compete with "DUM-DUMS" are unfair to us and to the trade. We propose to protect our trademark and to secure an injunction to stop the confusion that now exists.' "

2. During the first few months of the pendency of the case, defendant filed a motion to strike the complaint for failure to state a cause of action. The motion was heard and briefed, and on June 20, 1961, Judge Campbell of this Court entered a minute order reading as follows:

"Defendant's motion to strike plaintiff's complaint for failure to state a cause of action is denied."

Three weeks after the entry of Judge Campbell's order on June 20th, plaintiff issued a second press release which was sent to the same sixteen trade journals that had previously received plaintiff's initial announcement of the litigation and which read as follows:

"Spangler Candy Company's complaint against Crystal Pure Candy Company alleging trademark violation and unfair competition by the latter has been upheld by the Federal Court in Chicago.

"In the Chicago legal action, Crystal Pure had moved to strike Spangler's complaint upon the asserted ground that Spangler Candy Company was not entitled to any relief. The Federal Court held that the complaint stated a good cause of action. The trademark violation is being pursued."

Plaintiff's second press release was so timed that it was received and published

by the trade journals during the pendency of the National Confectioners Wholesale Convention in Chicago, Illinois. An editor added the headline, "Spangler Upheld."

3. Plaintiff also issued news bulletins to its sales representatives at periodic intervals during the pendency of the litigation. Plaintiff's sales representatives made repeated calls on candy buyers and discussed the pending litigation with them.

4. The press releases accurately described the information reported.

5. There is no evidence that the plaintiff's representatives did more than inform customers of the defendant that there was a suit and inform the customers that they might become involved as witnesses.

6. There is no evidence that the plaintiff acted maliciously or in bad faith; there is evidence that the plaintiff acted in good faith to protect its own business.

■ A trademark holder has the right to defend himself against infringement and to warn purchasers from the alleged infringer that they, too, might be liable to him. As the Court said in Lucien Lelong, Inc. v. Dana Perfumes, Inc., 138 F.Supp. 575, at 579 (N.D.Ill. 1955):

"While the above quoted language referred to patents, the same rule is applicable to trade-marks. The ownership of a valid trade-mark renders any one dealing in goods bearing the infringing mark liable even though he purchased the infringing goods innocently. See Callmann, Unfair Competition and Trade-Marks, 2d ed., 1950, vol. 4, sec. 87.2 (b) (1), p. 1772. Such a dealer may be required to respond by accounting for the profits derived from sales of the infringing goods and is not merely liable for damages. Hence the notice of infringement is an act of kindness to the dealer handling infringing goods."

Callman states the rule concerning infringement notices.

"Warnings are a type of self-defense; accordingly, they are governed by the rule of necessity. They are also expressions of opinion; and hence, must be made sincerely and in good faith. Finally, they offer necessary information about ordinarily complicated problems; and therefore, they must be made with extreme accuracy and caution, without personal invective, and if possible, in such a manner that the opinion may be substantiated and the assertions capable of verification." (Callmann Unfair Competition and Trade-Marks, 2d ed., 1950, vol. 2, § 42.4, p. 719.)

■ The privilege which is given to the trademark holder is limited. The statements which are made must not be false and must not have been issued in bad faith. Maytag Co. v. Meadows Mfg. Co., 35 F.2d 403, 408 (7th Cir. 1929).

It is clear from examining the evidence that the statements made by the plaintiff were reasonably accurate.

Bad faith is not shown by publication of the notice in trade journals. In Lucien Lelong, supra, the Court stated (138 F. Supp. at page 581):

"The fact that the same notice was sent to 5,000 customers and printed in three trade journals does not establish bad faith. The owner of a trademark has the right to stop all infringement. Its warning of suits for infringement may therefore properly be as widespread as the infringement. Callmann, Unfair Competition and Trade-Marks, 2d ed., 1950, vol. 2, sec. 42.4(a), p. 726. It is immaterial whether the notice is given directly to the alleged infringer, its customers or a trade journal. Aralac, Inc., v. Hat Corporation of America, 3 Cir., 1948, 166 F.2d 286, 292–293; Tel-O-Wave, Inc., v. Andre, Inc., D.C.Utah, 1947, 79 F.Supp. 799, 801."

Cf. Al-Fab Aluminum Fabricators, Inc. v. Wagner, 220 F.Supp. 715 (N.D.Ill. 1963).

I have found that the plaintiff acted in good faith to protect its business. The privilege is not lost when the court makes a finding, as it has here, that there has been no infringement:

"The right of the holder of a trade-mark * * * to warn others of infringement suits does not depend upon the validity of the trade-mark * * * so long as the holder believes his claims are valid." (Lucien Lelong, Inc., supra, 138 F.Supp. at 582.)

From the findings of fact and the discussion of the law, I draw the following conclusion of law:

7. Since the defendant has failed to prove bad faith or misstatement on the part of the plaintiff, the counterclaim fails and must be dismissed.

In accordance with the views herein expressed, I have on this day entered an order dismissing the plaintiff's complaint and dismissing the defendant's counterclaim.