The INSTRUMENTALIST CO., Plaintiff,

v.

MARINE CORPS LEAGUE et al., Defendants.

No. 80 C 5195.

United States District Court, N. D. Illinois, E. D.

Feb. 6, 1981.

Motion to Amend Findings Denied March 31, 1981.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Plaintiff The Instrumentalist Co. ("Instrumentalist") filed this action against defendants Marine Corps League ("League") and United States Marines Youth Foundation, Inc. ("Youth Foundation"), alleging that defendants have infringed Instrumentalist's registered mark "JOHN PHILIP SOUSA,"[1] violated Section 43 of the Lanham Act and committed acts of common law mark infringement and unfair competition in conjunction with their sponsoring of the "Semper Fidelis" award for high school band musicians. Instrumentalist has moved for a preliminary injunction to enjoin defendants from using (1) the Sousa name in a prominent fashion and (2) any representation of Sousa[2] in connection with the Semper Fidelis (or any) band award.

On January 14–16, 1981 this Court conducted a hearing on Instrumentalist's motion. For the reasons stated in this memorandum opinion and order, Instrumentalist's motion for a preliminary injunction is granted.

*Facts*[3]

Instrumentalist is an Illinois corporation that publishes "The Instrumentalist," a national music magazine devoted exclusively to school band and orchestra directors and to teachers of instrumental music. Since 1955 it has made available to high schools the "John Philip Sousa Band Award" (the

Gomer W. Walters, Haight, Hofeldt, Davis, Jambor, Chicago, Ill., for plaintiff.

Richard G. Lione, Hume, . Clement, Brinks, Willian & Olds, Ltd., Jerome Gilson, Chicago, Ill., for defendants.

1. United States Trademark No. 1,045,937 was issued to Instrumentalist August 10, 1976 in Class 20, for "awards in the nature of plaques." In fact defendants' award is in *certificate* form, as is one form of Instrumentalist's award that bears both the Sousa name and a depiction of Sousa (Instrumentalist also awards other items to its winners—a marble desk piece and a lapel pin—and sells to each awarding school a wall plaque, bearing Sousa's name and likeness, to maintain a record of its annual student winners). Because we deal with no constructive notice issues (defendants received actual notice of claimed infringement) and the mark has not become incontestable, no substantive rights flow from the fact of Instrumentalist's federal registration. In turn, the issue whether the parties' use is a trademark or servicemark use (the Court would regard the latter as more

descriptive of the award of a certificate) becomes a non-issue. For convenience and to avoid any digression in that respect, the Court will simply use the term "mark."

2. At the preliminary injunction hearing Instrumentalist effectively agreed (and its President James Rohner testified) that the relief it was seeking as to depictions of Sousa was limited in the same way as with respect to his name. It acknowledged that a *non*-prominent Sousa representation on defendants' certificate would not be the basis of a complaint of infringement or dilution on its part.

3. Relevant facts other than those stated in this section will be referred to where appropriate in this opinion.

"Sousa Award") for outstanding achievement in band music.

Over the years Instrumentalist has been careful to maintain strict "quality control" over the Sousa Award. Because the Award is intended to recognize the single outstanding graduating senior band member in each participating high school, Instrumentalist has refused to sell more than one Award to any one high school in any year, except in rare instances where a band director has certified that a tie has occurred and two Awards were appropriate that year. At each high school's election, the Sousa Award to the outstanding senior takes the form of one or more of a certificate with the name and picture of Sousa prominently displayed, a lapel pin and a marble desk piece (each of the latter two featuring a medallion relief of Sousa). As indicated in footnote 1, Instrumentalist also sells to each participating high school a wall plaque bearing Sousa's name and likeness.

Instrumentalist originally received authorization from Sousa's children in 1954 to initiate the Award. It has grown in importance and distribution over the past 25 years to an annual distribution to some 6000 high schools (aggregate Sousa Awards in the past eight years have come to 45–50,-000, with perhaps twice that number having been awarded over the entire 25-year period).

No efforts were made to obtain federal registration of any mark until 1966, when the secretary to Instrumentalist's President (the same person, a non-lawyer, who handled run-of-the-mill copyright filings for Instrumentalist) applied for trademark registration of the depiction of Sousa. In response the Patent Office wrote (Pl. Ex. 10):

On the basis of the record, registration is refused on the ground that the picture of John Philip Sousa constitutes merely the subject matter of the goods. Thus considered, it is not believed the picture functions as a trademark as defined in Section 45 of the 1946 Trademark Act. . . .

If desired, the services of a competent trademark attorney may be employed.

In view of the subject matter presented, however, it is not believed that registration of the mark will ensue.

Instrumentalist did not pursue the matter further at that time.

In 1973, when James Rohner succeeded his father as Instrumentalist's President, he directed the same counsel who have represented Instrumentalist in this action to file for federal registration. That application related to the Sousa *name* and was originally characterized as a servicemark application. In response to Patent and Trademark Office Actions, the application was amended to seek a trademark and to reflect a statement of goods "awards in the nature of plaques," and Registration 1,045,937 was then issued.

League is a United States corporation and Youth Foundation a Virginia non-profit corporation, both of whom work closely with the United States Marine Corps. Retired Marine Corps Major General Walter Churchill, now Chairman of the Board of a supermarket chain in Toledo, is National Commandant of the League, an organization founded to preserve the traditions and promote the interests of the Marine Corps, to provide a link between present and former Marines and to promote better citizenship among its members. As director of the League's youth activities, General Churchill developed and promoted several of its programs, including the band award that ultimately gave rise to this litigation. In 1967 General Churchill initiated the Youth Foundation, funded by individual and corporate contributions, which also seeks to foster comparable purposes, focusing primarily on youth activities.

Since 1967 League and Youth Foundation have been issuing a Distinguished Musician Award in cooperation with the National Band Association ("NBA") to outstanding high school band musicians. In January 1980 defendants decided to follow a suggestion General Churchill had urged for several years by changing the name of their award to the "John Philip Sousa Award for Musical Excellence." They had no prior knowledge of Instrumentalist or its Sousa Award

and thus no intention to infringe on anyone's claimed rights.

Instrumentalist learned of defendants' plans when one of the band directors who had participated in the Sousa Award for many years learned of the change in defendants' award and called to ask Instrumentalist whether it was giving up its Sousa Award. Instrumentalist immediately objected to the proposed renaming, asserting that it would constitute a violation of Instrumentalist's mark.

At that time defendants had already prepared a mock-up of its new award certificate, but as General Churchill testified he recognized that Instrumentalist "had every right to complain about a John Philip Sousa Award."[4] Accordingly, after conferring with the Marine Corps and with the Navy Patent Counsel, the mock-up was changed by substituting "Semper Fidelis" for the Sousa name on the newly-designed certificate, retaining the large multi-color likeness of Sousa on the front and the Sousa name and biography on the back. "Semper Fidelis" was of course chosen as the new name both because it was the name of one of Sousa's most famous marches and because "Semper Fidelis" is the Marine Corps motto.

As so modified, what is now defendants' "Semper Fidelis Award" is a certificate on which a colored picture of Sousa, covering nearly one quarter of the certificate's surface, is prominently displayed—indeed dominates the award visually.[5] Sousa's name appears in small type at the base of the picture. On the reverse side are "JOHN PHILIP SOUSA (1854–1932)" printed in large letters at the top and the biographical sketch focusing on Sousa's association with the Marine Band. Since the change in defendants' award the NBA no longer serves as co-sponsor with defendants.

Based on the original communications between the parties, Instrumentalist understood that defendants were changing their award not only by eliminating the Sousa name as the award designation but also by deleting the featured pictorial representation of Sousa. When Instrumentalist subsequently learned the latter was not the case, this suit and preliminary injunction hearing followed.

*Preliminary Injunction Considerations*

Instrumentalist maintains that the Semper Fidelis Award in its present form still infringes Instrumentalist's marks and also constitutes a violation of Section 43 of the Lanham Act and the common law of trademark infringement and unfair competition. In the latter respect, during the course of the preliminary injunction hearing Instrumentalist also invoked the provisions of the Illinois anti-dilution statute, Ill.Rev.Stat. ch. 140, § 22.

Our Court of Appeals has described the various factors to be considered by District Courts on motions for preliminary injunctive relief in *Banks v. Trainor*, 525 F.2d 837, 841 (7th Cir. 1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976):

> The appropriateness of granting a preliminary injunction depends upon a balancing of several factors, including the likelihood of success on the merits, the lack of adequate remedy at law, the prospect of irreparable harm if the injunction is not issued and a comparison of the relative hardships imposed on the parties.... No one factor is determinative; the district court should be flexible and is given discretion to fashion suitable temporary relief.

This opinion will treat with each of those factors in the context of Instrumentalist's motion.

4. To the same effect, Marine Major Joseph Reich, who was the Marine Corps officer principally involved in the communications with Instrumentalist and the consequent change of defendants' award, used the term "an honest mistake" in his testimony describing defendants' original proposed change to a "John Philip Sousa" Award.

5. That picture replicates a portrait of Sousa resplendent in his Marine Band uniform, essentially the same uniform in use by that Band today. Marine Lt. Col. Coppolino painted the original portrait, which is the property of the Marine Corps and located in its Washington, D. C., Museum.

*Likelihood of Success on the Merits*

Both parties have submitted extensive authority on the merits in connection with Instrumentalist's motion and defendants' counter-motion for summary judgment.[6] It is however not necessary for the Court to apply the "likelihood of success on the merits" test to each of Instrumentalist's theories, for satisfaction of that requirement as to any one theory is enough to support the injunction (provided the other requirements for injunctive relief are also satisfied). This opinion ultimately rests on the Illinois anti-dilution statute in that respect, but it is still useful to consider some aspects of Instrumentalist's other theories of defendants' possible liability.[7] Accordingly this opinion will treat with such other matters before turning to the anti-dilution theory.

■ (1) Instrumentalist's "JOHN PHILIP SOUSA" mark must of course be considered valid and enforceable. Instrumentalist's registration of that mark "shall be prima facie evidence of the validity of the registration . . . and of registrant's exclusive right to use the mark." *Miss Universe, Inc. v. Patricelli*, 408 F.2d 506, 509 (2d Cir. 1969). Defendants failed to refute that presumption by either their legal or their factual arguments. In injunction vocabulary, the very fact that Instrumentalist registered "JOHN PHILIP SOUSA" makes it "likely it will succeed on the merits" in asserting the mark's validity and enforceability. However, Instrumentalist has not really addressed the question whether registration of a mark for a category of goods described as "plaques" would carry those consequences against a claimed infringer through the use of award certificates—particularly where Instrumentalist itself was

unsuccessful in obtaining registration covering such awards.

(2) Defendants seek to make much of the fact that their award is no longer, as they originally set out to create it, designated by the Sousa *name*. But that argument is unavailing for at least two reasons.

■ First, even if Instrumentalist's mark (and the discussion throughout this opinion should be understood as referring to Instrumentalist's marks as *used*, not merely as federally *registered*) were only the Sousa name, defendants' position would still be countered by the well established principle that "words and their pictorial representations are treated the same in determining the likelihood of confusion between two marks." *Beer Nuts, Inc. v. King Nut Company*, 477 F.2d 326, 329 (6th Cir. 1973). Thus the fact that defendants' certificate most prominently displays a picture of Sousa (rather than a literal transcription of his name) does not preclude a finding of infringement here. Testimony at the hearing confirmed the probable applicability of the *Beer Nuts* principle to the facts of this case. Both Messrs. Trimborn, the Director of Bands at Palatine High School, and Nelson, who holds the same position at Aurora East High School, stated that their first association upon hearing the name Sousa was his "image" or picture. Conversely, not only those witnesses called by Instrumentalist but also defendants' own expert witness on the musical aspects of the case confirmed the immediate recognizability of the Sousa likeness in almost any depiction. There is no question that in the relevant market— band musicians—Sousa's likeness brings instant recognition. In short, the use of the Sousa name and use of his picture are really interchangeable for infringement purposes.[8]

---

**6.** Because there are clearly contested issues of material fact, summary judgment for either party is inappropriate and defendants' counter-motion is denied.

**7.** Such other consideration both casts light on the legal relationships between the parties and is likely to be relevant on the ultimate decision as to the merits of the litigation.

**8.** Relatedly, to the extent that Lanham Act rights are involved defendants cannot escape

liability under the "fair use" defense of Section 33(b)(4) on the theory that the use of Sousa's picture in the Semper Fidelis Award is "otherwise than as a trade or service mark." Section 33(b)(4) applies only if defendant's "use" of the mark is other than a trade or service mark *and* the mark is the defendant's name, the name of someone in privity with him or describes his goods or services or their geographic origin. None of those conditions is present here.

Second and more important, it must be recognized that Instrumentalist uses Sousa's *picture* as well as his *name* as a mark. Its Sousa Award, at the election of each awarding school, takes the form of one or more of the certificate, a marble desk piece and a lapel pin. Each of the last two items features not the Sousa name but his *likeness*. Director Trimborn, himself a Sousa Award winner as a high school student (he characterized the Award as the "highlight of his musical career," having a strong positive impact on his family and reinforcing its support of music as a career choice for him), received only the lapel pin. Though it does not have the Sousa name at all, musicians often comment on it with familiarity—with unquestioned recognition. In the same way, the "image" testimony referred to earlier reinforces the identical conclusion. Indeed, this Court, wholly lacking the trained background of the persons to whom both parties address their wares, recognized the Sousa visage immediately from both pictorial representations, quite independently of the name. All this leads to the conclusion that infringement of Instrumentalist's other mark—the likeness of Sousa used in awards—may be found without having to rely on the alternative *Beer Nuts* principle.

(3) Defendants filled the record with evidence, not subject to question, that established Sousa's historical association with the Marine Corps. But that material is really beside the mark. From the *Marine Corps* perspective Sousa may well be a Marine musician, for he began his career as a member of the Marine Band in his teens and later directed that band for a dozen years. But the record is plain and uncontroverted that from the *musician's* perspective Sousa's name and Sousa's image evoke not *Marine* connotations but those of the *ultimate band musician*:[9]

1. Defendants' own expert witness, Assistant Professor Maxine Lefever, is Assistant Director of the Purdue University Band, the Executive Secretary of the John Philip Sousa Memorial Foundation and formerly Executive Secretary of the NBA. After she had testified that when asked about Marine Band conductors she (and she believed the great majority of musicians) would think of Sousa first (which for the reason earlier stated is really not the relevant question in this litigation), she confirmed that Sousa himself is best known as director of his own *Sousa Band* and as a composer. In other words, the musicians' primary identification of Sousa is *not* that of Marine musician.

2. Def. Ex. 28 is a large color reproduction of the same painting defendants use in their award, issued as a promotional piece by Ostwald Uniform as part of its "Great American Bandmasters" series. Significantly, the extended biographical description of "The March King" follows its first two paragraphs, which describe his beginnings with the Marine Band, by then presenting a lengthy description that confirms Sousa's far greater significance after he left the Marine Corps and formed his own band "to adopt the role of entertainer and reach millions, rather than the few" (Appendix A to this opinion reproduces the entire biographical discussion in Def. Ex. 28).

3. Director Nelson, himself an ex-Marine with World War II service (as he put it, "Once a Marine, always a Marine"), was certainly not a witness unfriendly to defendants. But he too identified the first organizational association with Sousa as that of the Sousa Band, *not* the Marine Band, and the dominant other Sousa association as involving his compositions.

4. Director Trimborn testified from his experience and familiarity with Sousa's music, marches and history, having written articles about Sousa. Trimborn's testimony too was that the first association with Sousa and his image was with

---

9. This fact also bears on defendants' contention that the use of Sousa's name or picture for award purposes is "otherwise than as a trade or service mark." At worst, in the categories into which these matters are often divided, the Sousa name or image for a musical award is a "suggestive" mark—but nonetheless a mark.

his march music and Sousa's Band, and not with his previous directorship of the Marine Band.

In short, the relevant question is not what answer first comes to mind in a free association response to the term "Marine Corps musician,"[10] but rather what associations are first called forth by the name or image of Sousa. On that score defendants have failed to demonstrate that the Marine Corps' historical association with Sousa justifies otherwise impermissible use of his name or image.

(4) Count I of Instrumentalist's Complaint alleges that defendants' Semper Fidelis Award infringes Instrumentalist's trademark. Lanham Act Section 32 states the test for infringement (emphasis added):

> (1) Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction... or colorable imitation of a registered mark... with which such use *is likely to cause confusion, or to cause mistake, or to deceive...*
>
> shall be liable in a civil action....

Courts have fashioned numerous tests for determining whether a "likelihood of confusion" exists. *See, e. g., In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A.1973). Our own Court of Appeals has stated that "evidence must be evaluated on the basis of whether it disclosed a likelihood that consumers generally familiar

with... [plaintiff's] marks would be likely, upon seeing only... [defendant's mark], to believe that [defendant's]... enterprise was in some way related to, or connected or affiliated with, or sponsored by, ... [plaintiff]." *James Burrough, Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976).

That test is not easily applied in the context of a preliminary injunction motion, where the parties have had relatively little opportunity to ascertain the level of confusion among the relevant consumers. Nevertheless, against that background, this Court considers two factors as pertinent to the likelihood of confusion issue in this action:

(a) High school band directors who make the decisions respecting the presentation of band awards are the relevant "consumers" in this case. They can be expected to be reasonably sophisticated with respect to the Sousa Award. Both Mr. Trimborn and Mr. Nelson were quite familiar with the Award, and if their familiarity is characteristic this Court would expect band directors to be somewhat sensitive to the distinction between the Sousa Award and others.

(b) With the possible exception of Pl. Ex. 19 and 20,[11] Instrumentalist has been unable to cite any actual instances of confusion.[12]

---

10. Each of directors Trimborn and Nelson testified that their first association with the Marine Band would be with its two leaders William H. Santelmann and William F. Santelmann, father and son, who between them spanned nearly 45 years of leadership. Professor Lefever testified that though she respected the Santelmanns greatly, her first association would be with Sousa. For the reasons already indicated, that conflict need not be resolved for purposes of this opinion.

11. One high school music director wrote Instrumentalist's magazine:

As you have done so in the past, please print the enclosed photos and information of recipients of Instrumentalist awards.

There followed a listing (and pictures were enclosed) not only of the Instrumentalist awards (including the Sousa Award) but also of the Semper Fidelis Award having been presented by a Marine Sergeant. This Court would have

read that as a clear instance of actual confusion. Professor Lefever then testified that *on her own* she had called the author of the letter and that she told her that he knew of the relationship between Instrumentalist and NBA and the relationship (now terminated) between defendants and NBA, and essentially that there was no conflict in his mind between the awards. In light of the conclusion reached in the text, it is unnecessary to comment further on the effect of this evidence or the questionable admissibility of that telephone conversation.

12. At this relatively early stage of the controversy, the absence of such instances is not particularly probative. Moreover, it should be noted that the Sousa Award certificate does not include Instrumentalist's name at all (President Rohner testified that Instrumentalist does not use the certificate for self-advertising), while the Semper Fidelis Award includes both de-

Conversely, this Court does not view defendants' identification on their award as a compelling factor negating likelihood of confusion. Given the absence of source information on Instrumentalist's certificate, confusion of a different type might well result—either in the form identified in footnote 12 or in such reactions as that of Band Director Nelson, who thought that Instrumentalist might have given up its own award to be supplanted by defendants'.[13]

On the record now before the Court, Instrumentalist's probability of success on the merits on the issue of likelihood of confusion is at best uncertain. Instrumentalist can prevail on that issue only if it demonstrates that defendants' use of the Sousa mark creates a likelihood, and not a mere *possibility*, of confusion. *HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 717 (9th Cir. 1974). Though the issue on the ultimate merits remains open, this Court rules that Instrumentalist has not carried its burden on the present motion—that of demonstrating that its ultimate success on the "likelihood of confusion" issue is itself likely.

All the foregoing discussion, though lengthy, is really preliminary to the controlling issue on "likelihood of success": whether Instrumentalist is likely to succeed on the merits of its argument that defendants' award would "dilute" the distinctiveness of the Sousa Award. Defendants contend that a "dilution" theory is not cognizable under the federal law of trademark infringement, *see, e. g.*, Callman, *Unfair Competition, Trademarks and Monopolies* § 84.2 (3d ed.). Additionally, defendants argue that such cases as *Stork Restaurant, Inc. v. Sahati*, 166 F.2d 348 (9th Cir. 1948) (a case brought under federal trademark law) offer no basis for relief predicated on dilution, pointing out that *Stork Restaurant* was based on a finding of likelihood of confusion.

But defendants' arguments do not refute the potential applicability of the Illinois Anti-dilution statute,[14] Ill.Rev.Stat. ch. 140, § 22, to this case (emphasis added):

> Every person, . . . adopting and using a mark, [or] trade name, may proceed by suit, and the circuit court shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark, [or] trade name, . . . if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, [or] trade name, . . . of the prior user, *notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services. . . .*

Case law confirms the plain language of the statute in requiring neither a finding of likelihood of confusion or competition between two parties using the same mark.

---

fendants' names. Because Instrumentalist would usually have no way of learning of instances of actual confusion (for example, a band director might simply order defendants' award having heard of, and thinking it is, the Sousa Award—and thus never contact Instrumentalist), this Court would not consider the absence of instances of actual confusion ultimately dispositive of Instrumentalist's infringement claim. Nonetheless, Instrumentalist's contention that likelihood of confusion exists is of course weaker than it would be if instances of actual confusion were in evidence.

**13.** As a final note on the confusion issue, this Court does not credit Instrumentalist's attempted reliance on the Marine Corps Commandant's April 11, 1980 letter regarding the change in the proposed "John Philip Sousa Award for Musical Excellence" to the Semper Fidelis Award (Def. Ex. 37). Commandant Casey stated:

> There is already a civilian award entitled the "John Philip Sousa Band Award," and in order to preclude confusion, it was decided that changing the title would be in the best interests of the Marine Corps.

That statement is not directly probative on any likelihood of confusion by the *renamed* defendants' award containing Sousa's picture.

**14.** In response to this Court's inquiry during oral argument, defendants as well as Instrumentalist acknowledged that this Court would retain pendent jurisdiction over Instrumentalist's claims under Illinois law even if Instrumentalist were to fail on the federal claim that brings the case within this Court's ambit. Accordingly this Court may issue an injunction under the state statute even though the federal claims would not support that action. *See generally*, Gilson, *Trademark Protection and Practice* § 8.03[5].

*See, Polaroid Corp. v. Polaraid, Inc.,* 319 F.2d 830, 836 (7th Cir. 1963); *Edgewater Beach Apartments Corp. v. Edgewater Beach Management Co., Inc.,* 12 Ill.App.3d 526, 534, 299 N.E.2d 548 (1st Dist. 1973). In fact Illinois case law indicates that the statute was intended to operate *only* where relief is unavailable under traditional theories of unfair competition, under which likelihood of confusion and the existence of competition are usually requisite elements. *See, e. g.,* the *Edgewater Beach* case and *Capitol Tie Rack, Inc. v. Tie Rack Stores of Illinois, Inc.,* 150 U.S.P.Q. 357, 360–61 (N.D. Ill.1966).[15]

Even on that view of the statute, it offers Instrumentalist the prospect of relief in this instance. Defendants themselves urge strenuously that there is no likelihood of confusion between the Sousa and Semper Fidelis Awards and that defendants are not in competition with Instrumentalist. They will not be heard to argue the contrary to avoid the applicability of the anti-dilution statute.

*Edgewater Beach* might alternatively be read to limit relief under the anti-dilution statute to instances in which relief under all other theories is unavailable. This Court has already considered the unavailability of relief under Lanham Act Section 32 at length. It appears that defendants are correct in asserting that relief under Section 43(a) and under the common law of unfair competition (apart from dilution theories) is also unavailable for the same reason: Instrumentalist's failure to demonstrate likelihood of success on the merits as to the likelihood of confusion. *See,* Gilson, *supra,* § 5.01 at 5–3; *Lady Esther, Ltd. v. Lady Esther Corset Shoppe, Inc.,* 317 Ill.App. 451, 46 N.E.2d 165 (1st Dist. 1943).

Thus although (or perhaps because) Instrumentalist has not shown the requisite likelihood of confusion to support an injunction under Lanham Act Section 32, Instru-

mentalist may still obtain relief under the Illinois Anti-dilution statute provided it demonstrates a "likelihood of success on the merits" as to whether the Semper Fidelis award "dilutes" the Sousa Award. Our Court of Appeals in *Polaroid Corp.,* 319 F.2d at 836, approved the Callman treatise's definition of dilution:

> The gravamen of a dilution complaint is that the continuous use of a mark similar to plaintiff's works an inexorably adverse effect upon the distinctiveness of the plaintiff's mark, and that, if he is powerless to prevent such use, his mark will lose its distinctiveness entirely. This injury differs materially from that arising out of the orthodox confusion * * *. Such confusion leads to immediate injury, while dilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark.

Instrumentalist's Sousa Award has acquired uncontroverted distinctiveness. For 25 years it has been awarded to the most accomplished senior band member of each participating high school (now over 6000 in number). Instrumentalist's quality control has been tight and consistent. As already indicated, Band Director Trimborn testified at length as to the significance of the award in his life and generally among recipients. Band Director Nelson presents a number of awards at his school's annual band banquet, but the Sousa Award is the "plum"—the finale of the evening, based on Mr. Nelson's personal selection, with the kind of prior confidentiality familiar in Academy Award presentations. In short, on the present record the Sousa Award is *the* high school band award.

Messrs. Trimborn and Nelson and President James Rohner of Instrumentalist also testified at length as to the potential effect of the Semper Fidelis award on the distinctiveness of the Sousa Award. Rohner

---

**15.** This Court views that reading as not readily supported by the statutory language. However, where as here Illinois law provides the rule of decision, this Court is bound to follow

*Edgewater Beach* in that respect (unless it believes that the Illinois Supreme Court would plainly go the other way, a conclusion it will not stretch to reach).

claimed that an "erosion" of the Award's prominence was inevitable. Trimborn confirmed that contention, stating that as a recipient of the Award he would be upset because of its loss of significance should another award bearing Sousa's likeness be widely distributed. Nelson testified that the distribution of the Semper Fidelis award would "water down" the significance of the Sousa Award.

Defendants simply failed to respond to the "erosion" or "dilution" testimony offered by Instrumentalist. Their evidence and testimony focused instead on the extensive use the Marine Corps would and should be entitled to make of defendants' Semper Fidelis Award as presently designed, a factor only lending support to Instrumentalist's claim that dilution would result.[16] Marine Major Reich testified that after the Semper Fidelis Award with the dominant Sousa picture was adopted, the number of awards defendants were able to present jumped from the previous annual average of about 2500 to some 2700, and that for the first time several calls had been received from pleased band directors and students (in prior years the only calls were a few complaints). Both those factors tend to validate the value of the Sousa image to such awards and the consequent prospect of dilution of value of Instrumentalist's Sousa Award.

On the basis of all the testimony and evidence introduced at the hearing, this Court finds that Instrumentalist has met its burden of demonstrating its likelihood of success on the merits of a dilution claim under the Illinois statute. We turn then to the other elements Instrumentalist is required to establish.[17]

### Lack of Adequate Remedy at Law and the Prospect of Irreparable Harm

Instrumentalist has amply demonstrated the difficulty it would encounter in attempting to calculate the damages it would incur should defendants be allowed to distribute the Semper Fidelis Award in its present form. As Instrumentalist's President Rohner put it, there is no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer. Difficulty of proving damages that would fully compensate a plaintiff for the loss of its good will usually warrants a finding of lack of adequate remedy at law and the prospect of irreparable harm. *See, e. g., Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971). Defendants have not even argued that these requirements for the issuance of a preliminary injunction have not been satisfied here, nor does this Court find any reason to reject Instrumentalist's contentions on this score.

### Balancing of the Hardships

Were no injunction to issue, the consequent hardships imposed on Instrumentalist

---

16. It is important to emphasize the context in which the dilution claim is presented in this action. Instrumentalist is of course not generally permitted to suppress awards that detract from the preeminence of the Sousa Award simply because the Sousa Award has obtained such preeminence. However, the Illinois Anti-dilution statute does authorize Instrumentalist to insist that its own mark not be used in connection with the "diluting" award. In the present form of defendants' award, it plainly uses the Sousa picture as a mark (and perhaps the Sousa name as a mark as well, though that determination need not be made) in a way that dilutes the value of Instrumentalist's corresponding mark(s).

17. No Illinois or federal court has addressed the question whether (1) the lack of an adequate remedy at law, (2) the prospect of irreparable injury and (3) a balancing of relative hardships must be considered in issuing an injunction based on the Illinois Anti-dilution statute. That statute literally says that the Court "*shall* grant injunctions" where a plaintiff proves dilution (by use of the same or a similar mark), suggesting that the judge's usual discretion is limited and that no other requirements need be satisfied. However, because the present motion is for a *preliminary* injunction and the statutory terms may be read as applying to *final* relief, this Court will discuss and apply the normal injunctive criteria.

are largely evident from the earlier discussion and need not be restated at length. In short, in the absence of an injunction defendants will be allowed to engage fully in the sale and distribution of their award at the expense of incalculable dilution of the Sousa Award's distinctiveness.

In response, defendants essentially assert three types of claimed hardship:

(1) Defendants will be prohibited generally from using Sousa's image to promote the Marines, even though Sousa's association with the Marines is especially illustrious.

(2) Defendants will suffer a diminished stature of the Semper Fidelis award.

(3) Defendants will be forced to alter the award in short order in time for spring 1981 presentations, causing friction with band directors and loss of support among the high schools.

As to the first claimed hardship, defendants would not in fact be foreclosed generally from making use of Sousa's association with the Marine Corps for publicity purposes. Rather they would be narrowly foreclosed from the prominent use of Sousa's name or image in conjunction with awards made to high school band members.

Defendants' second alleged hardship must be directly balanced against the loss of stature—the dilution—the Sousa Award would incur should defendants be allowed to use Sousa's likeness and image in the manner they have now undertaken. Stated differently, the relevant balancing is that of the traditional association with Sousa that each *award* enjoys: 25 continuous years of building a proprietary interest measured against a 1980 adoption of the Sousa identification. In that uneven contest Instrumentalist must prevail.

Finally, the third "hardship" defendants allege involves small dollars (probably less than $2,000 in printing and redistribution costs).[18] But both the substantive and the

timing problem are essentially of defendants' own making.

When Instrumentalist first learned of defendants' proposed revision of their "Distinguished Musician Award," Instrumentalist objected vigorously to defendants' use not only of the Sousa name but of his picture. Defendants should plainly have expected the objections that ultimately resulted in this litigation.

Indeed, when the parties reached their initial understanding after Instrumentalist first protested, President Rohner wrote General Churchill and NBA President Julian on March 10, 1980 (Pl. Ex. 17, emphasis added):

> After conversations with each of you and with Major Reich of the Marine Recruiting Office in Washington, I think it would be helpful to put in writing the statements of each of us.
>
> 1. As I have indicated, The Instrumentalist Company holds a registered trademark, # 1045937 dated August 10, 1976, on the John Philip Sousa Band Award. We would resist the use by anyone of the name John Philip Sousa *or a photograph of him* in connection with any music awards. We would have no objection if the Marine certificate in the body of the text made some reference to the "fine tradition of John Philip Sousa when he was Marine Band Leader," provided there was no attempt to make the Marine Award a Sousa Award.
>
> 2. Mr. Julian has firmly stated that N.B.A. has not been consulted to date about changing the name of the N.B.A.-Marine Award, that no change has been authorized, and that no change could be authorized except by the executive committee of N.B.A. He has further stated that he will not sign any certificates that bear the name *or photograph of John Philip Sousa.*
>
> 3. General Churchill has indicated that he will not print any certificates bearing

---

**18.** Defendants' "Dear Band Director" letters simply refer to the "Semper Fidelis" award, so

no corrective correspondence will be required in that respect.

the name *or photograph of John Philip Sousa* this year. If any plans for future years include such use, he will submit the materials to us.

4. Major Reich of the Marine Recruiting Office in Washington has indicated that Navy attorneys are reviewing the trademark. If for any reason the decision is made to use the *photograph* or name *of "John Philip Sousa"* he will submit the material to us so that we might have our trademark attorneys confer with his.

I appreciate the help of each of you on this matter. I fully realize that the contemplated change resulted from admiration for a fine band leader, Sousa.

General Churchill and Major Reich deny that the letter accurately reflected the understandings resulting from their conversations, but there is no need to resolve that difference of recollection. What *is* significant is that neither of them ever responded to that letter, or in any other way did or said anything, to express their disagreement. Instead, they reached the decision to re-change the award name but *retain* the dominant Sousa picture, yet they remained silent on the latter point.

When Rohner called Major Reich again in early April 1980 to obtain confirmation of defendants' discontinuance of their proposed John Philip Sousa Award, Reich told him that it had been changed to the Semper Fidelis Award but said nothing to disabuse Rohner of his impression regarding the Sousa picture (making no statement on that subject), though Reich testified he *knew* of Instrumentalist's objection to the use of the Sousa picture. General Churchill similarly testified that defendants had no intention of doing away with the Sousa picture, but that he was not about to disclose to Instrumentalist that the Marine Corps was studying the matter and that he did not answer Rohner because he depended on the Corps to do so. Finally, when Major Reich re-

sponded to Rohner's request to send him a copy of the Marine Corps letter regarding the change so that Rohner would have some written confirmation, Reich simply forwarded that letter (Pl. Ex. 18, App. B to this opinion) and was again silent regarding the use of a Sousa picture in the revised award, without touching on what Reich regarded as Rohner's false impression reflected in Rohner's March letter.

Major Reich spoke in his testimony of wanting the revised award to develop "something representative and befitting the dignity of the Marine Corps." General Churchill testified that he had urged a change in the prior drab form of award for some eight years to "take advantage of the great traditions of the Corps." But the conduct reflected here, lulling Instrumentalist into a misplaced sense of security, is scarcely in those great traditions. Had defendants or the Marine Corps been candid with Instrumentalist, and had the matter remained unresolved through agreement, Instrumentalist could have sought an earlier legal determination of the parties' dispute, and the time and expense "hardships" of which defendants now complain would have been averted entirely.

Under all the circumstances the balancing of hardships clearly favors the granting of relief to Instrumentalist. This last factor too has been satisfied so as to permit preliminary injunctive relief.

### Conclusion

Instrumentalist is entitled to a preliminary injunction of the scope indicated at pages 325, 326 of this opinion. It is directed to submit a proposed decree to the Court and opposing counsel on or before February 17, 1981, and defendants' counsel are directed to submit comments thereon to the Court and to counsel for Instrumentalist on or before February 24, 1981.

APPENDIX A

# GREAT AMERICAN BANDMASTERS

# John Philip Sousa
## 1854-1932
### Composer—Conductor—Entertainer

*Ostwald*

To the band music community with compliments:
Ostwald Uniforms/Macmillan Ward Ostwald, Inc.
P.O. Box 70, Ostwald Plaza, Staten Island, New York 10314

## THE MARCH KING

John Philip Sousa was born into the world of music, having as a father a member of the Marine Corps Band. The senior Sousa arranged—when John Philip was 13—for his musician son to become an apprentice to this same military band.

After seven years as an apprentice, John Philip Sousa left the Marine Corps at the age of 20 to taste the musical world beyond the military. After five productive, instructive years working in the commercial world of bands, Sousa reenlisted in the corps in 1880 and was appointed to the post of conductor of the band. Over the succeeding 12 years, he forged this musical unit into what was called "America's premier military band."

The *Knight of the Baton*, as Sousa was often called, shed the role of military bandmaster to form his own band in 1892. With his own band he enjoyed the freedom to bring his inimitable conducting style to the world-at-large. At this juncture in his career, Sousa decided to adopt the role of entertainer and reach millions, rather than the few.

The Sousa Band was triumphant wherever it appeared. It criss-crossed the United States innumerable times bringing music to those millions Sousa wished to entertain. As his fame spread, Sousa took his band to distant shores and was received with equal warmth and affection in many parts of Europe. Then, in 1910, the Sousa Band embarked on its famed world wide tour.

John Philip Sousa's contribution to the library of music literature would have earned him a well-deserved place in music history, had he never raised a baton or stridden upon a stage. Sousa was a prolific composer, turning out over 130 marches, more than 60 songs, more than a dozen operettas and scores of other suites, waltzes, dances, humoresques, etc.

Active until the day of his death in 1932 at the age of 77, John Philip Sousa won the acclaim of his fellow bandmasters on many occasions. None was more fitting than the richly deserved tribute paid him in Middletown, Ohio in 1929. By overwhelming majority, John Philip Sousa was elected the first president of the prestigious American Bandmasters Association at its first annual convention.

Tributes to his talent and genius are ever ongoing. In August, 1976 an enshrinement ceremony was held in Washington, D.C. placing John Philip Sousa in the Hall of Fame for Great Americans.

Though called by a variety of designations—The Dickens of Music—The Berlioz of the Military Band—The Kipling of Music—perhaps none fit John Philip Sousa better than the "Pied Piper of Patriotism." John Philip Sousa left us with a spine-tingling heritage—American band music that stirs the spirit and fills the heart with pride and love of country. He will always be remembered for his most stirring marches like *The Washington Post; Stars And Stripes Forever; Semper Fidelis.*

## APPENDIX B

<u>MEMORANDUM</u>

FROM: *Maj J. D. Reich*                    *15 April 80*
                                               DATE

TO: *Mr. J.T. Rohmer*

SUBJ: *Sousa Award*

*1. As promised, the attached letter
is provided for your information.*

*2. As discussed, the letter's content
was passed to the addressees by
telephone in advance of the letter.*

*Sincerely,*

*J D Reich*

*Major, U.S. Marine Corps*

## APPENDIX C

DEPARTMENT OF THE NAVY
HEADQUARTERS UNITED STATES MARINE CORPS
WASHINGTON D.C. 20380

[SEAL]                    IN REPLY REFER TO
                              MRRE–hpp
                              11 APR 1980

From: Commandant of the Marine Corps
To:   Commanding General, Marine Corps Recruit Depot,
      San Diego, California 92140
      Commanding General, Marine Corps Recruit Depot,
      Parris Island, South Carolina 29905
      Directors, All Marine Corps Districts
Subj: The John Philip Sousa Award for Musical Excellence
Ref:  (a) CMC ltr MRRE–drb dtd 23Jan80 on the John Philip
      Sousa Award For Musical Excellence

1. The "John Philip Sousa Award for Musical Excellence" has undergone several changes since reference (a) was published.

2. The National Band Association (NBA) will not be associated with the program this year. Their emblem, name and president's signature have been deleted from the certificate. This action became necessary since the Association's Executive Committee was unable to review the new certificate before their June 1980 meeting. All recruiters should be informed of this modification, as a few may use the NBA as a "selling point" with some band directors. Furthermore, the name of the award has been changed to the " 'Semper Fidelis' Award for Musical Excellence" after one of Sousa's marches—one he dedicated to the Marines. There is already a civilian award entitled the "John Philip Sousa Band Award," and in order to preclude confusion, it was decided that changing the title would be in the best interests of the Marine Corps.

3. The certificates will be mailed "priority/certified" to the individual recruiting stations directly from the printer, within a promised three-week period. The District project officers are asked to ensure the receipt of the certificates at each recruiting station by 30 April 1980. If a recruiting station does not receive its package of certificates by the above date, this Headquarters should be notified.

/s/   C.R. CASEY
      By [signature]

## On Motion To Amend Findings

On February 6, 1981 this Court issued its Memorandum Opinion and Order (the "Opinion") granting the motion of plaintiff The Instrumentalist Co. ("Instrumentalist") for a preliminary injunction against defendants Marine Corps League and United States Marines Youth Foundation, Inc. In general the injunctive relief was to apply to certain uses by defendants of (1) the name John Philip Sousa ("Sousa") or (2) any representation of Sousa in connection with the Semper Fidelis (or any) band award.

In the Opinion the Court directed Instrumentalist to submit a proposed decree embodying the principles expressed in the Opinion and also directed defendants' counsel to submit comments on that proposal. Subsequently the Court asked the parties' comments on a form of draft order. Both sides have favored the Court with not only comments but supporting memoranda dealing with the Opinion and draft order. Having reviewed those submissions the Court today enters a Preliminary Injunction Or-

der (the "Order") in the form attached as Exhibit A.*

In determining the scope of the Order, the Court has also taken into account defendants' March 16, 1981 motion "to amend findings and preliminary injunction order under Rule 52(b) or, in the alternative, for a stay of the preliminary injunction pending appeal under Rule 62(c)." For the reasons stated in this memorandum opinion and order (which treats both the motion and the corresponding reasons for the relief granted by the Order), defendants' motion is denied.

In their motion defendants contend that the Opinion and the Court's original draft order were deficient in four respects, claiming that:

(1) the Opinion rests on an erroneous application of the Illinois Anti-dilution Statute, Ill.Rev.Stat. ch. 140, § 22;

(2) the scope of the injunction can properly encompass only activity within the State of Illinois;

(3) as demonstrated in the hearing on Instrumentalist's motion for a preliminary injunction, the Marine Corps, a non-party, was an indispensable party under Fed.R.Civ.P. ("Rule") 19 and therefore the Court has improperly considered this action; and

(4) the proposed injunction order is insufficiently specific.[1]

### 1. Applicability of the Illinois Anti-dilution Statute

Defendants claim that this Court erroneously applied the Illinois Anti-dilution Statute (the "Act") in granting Instrumentalist's motion for a preliminary injunction. Specifically they contend that where the products of plaintiff and defendant are in competition, "the Illinois statute adds no legal rights whatsoever if the plaintiff has failed to sustain its burden of proving likelihood of confusion under the Lanham Act or under state unfair competition law." Defendants cite for that proposition *Filter Dynamics International, Inc. v. Astron Battery, Inc.*, 19 Ill.App.3d 299, 311 N.E.2d 386 (3d Dist. 1974), and *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705 (7th Cir. 1972). Because this Court concluded in the Opinion that Instrumentalist had failed to demonstrate "likelihood of confusion," defendants reason that granting relief under the Act was improper.

Defendants have simply misread the Opinion. Contrary to defendants' assertion,[2] this Court did not hold that defendants and Instrumentalist are in competition. In fact the Court expressly observed that *defendants* had vigorously asserted the contrary position—that the Sousa Award and the Semper Fidelis award are *not* in competition—and that for purposes of the motion before the Court, they would not be permit-

---

* After this opinion was issued the parties settled the litigation, so that no Preliminary Injunction Order was entered.

1. Defendants also maintained that the order impermissibly referred to a document outside the order itself and failed to require plaintiff to "give security." In its final form the Order attaches the documents referred to and makes a specific determination as to the necessary security in accordance with Rule 65(c).

2. Defendants apparently rely on the statement in the Opinion that "this Court, [is] wholly lacking in the trained background of the persons *to whom both parties address their wares* . . ." (emphasis added) in concluding that the Court found Instrumentalist and defendants to be in competition. It is of course true that both parties solicit participation in their awards by high school band directors—the fact to which that statement refers. However, viewed in the context of the entire Opinion and of the testimony and evidence presented at the hearing, that statement cannot be fairly read to support defendants' conclusion. Nothing about the concurrent availability of the awards suggests that a band director is placed in the position of a conventional consumer choosing between competing products—both awards easily could be (and, the record reflects, have been) presented at the same high school. Instrumentalist's Sousa Award was characterized by Band Director Ed Nelson as the "plum," awarded at the end of annual dinners or like functions involving presentation of various awards. As would not be the case with truly competing "products" (see n.3), one award's utility is not eliminated by virtue of the fact that the other has been "purchased." Indeed, the very fact that the word "purchased" must be put in quotes, because defendants and the Marine Corps are not engaged in commercial activity at all, underscores the inappropriateness of conventional concepts of competition in analyzing this case. Dilution is an accurate characterization of the loss of uniqueness Instrumentalist's Sousa Award would suffer were defendants' conduct to continue.

ted to blow hot and cold on the same issue (Opinion at 332). Accordingly *Filter Dynamics* and *Alberto-Culver*, both of which addressed circumstances in which the relevant products were plainly in direct commercial competition,[3] are inapplicable and the principles set out in *Edgewater Beach Apartments Corp. v. Edgewater Beach Management Co., Inc.*, 12 Ill.App.3d 526, 299 N.E.2d 548 (1st Dist. 1973), discussed at length in the Opinion, warrant the relief granted.

■ It should also be noted that to the extent *Filter Dynamics* and *Alberto-Culver* may arguably be read as inconsistent with *Edgewater Beach* (a reading in which this Court does not indulge), this Court deems itself bound by the *Edgewater Beach* decision. As it has stated in *National Can Corp. v. Whittaker Corp.*, 505 F.Supp. 147, 148–49 n.2 (1981) the Court believes that *Erie* requires it to decide state substantive law questions in the same way that a state trial judge counterpart sitting in the same location would:

> Where as in this case legal principles have been very recently proclaimed by the Illinois Appellate Court for the First District, with no contrary indications from the Illinois Supreme Court, this Court is obligated to adhere to those principles just as a judge of the Circuit Court of Cook County would.[4]

**3.** In *Filter Dynamics* defendant and plaintiff both manufactured automobile batteries; in *Alberto-Culver* each party manufactured feminine deodorant spray. Each case involved alleged infringement and dilution of marks in connection with the defendant's packaging of its competing product.

**4.** Though in Illinois the opinions of any appellate court are binding on all of the State's circuit courts, where two or more appellate districts are in conflict the circuit court is required to follow the decision of the appellate court of its district. *People v. Thorpe*, 52 Ill. App.3d 576, 579, 10 Ill.Dec. 351, 367 N.E.2d 960 (2d Dist. 1977); *Garcia v. Hynes & Howe Real Estate, Inc.*, 29 Ill.App.3d 479, 482, 331 N.E.2d 634 (3d Dist. 1975).

**5.** Even were that analysis inapplicable, the Court would view the alternative Supreme-Court-predictive approach to ascertaining Illi-

*Edgewater Beach*, a decision of the Appellate Court for the First District, would therefore prevail over any contrary aspect of *Filter Dynamics*, a Third District decision.[5] *Alberto-Culver*, a Court of Appeals decision, antedated *Edgewater Beach* and cannot in any event be considered a definitive (or superior) pronouncement of *Illinois* law.[6]

Defendants contend that the Act is inapplicable in two other respects. First they argue the Court held that Instrumentalist's *award* was being diluted, while the Act authorizes relief only for the dilution of "marks, trade names, labels or forms of advertisement." That quibble is frivolous at best. There is no question that the award embodies Instrumentalist's *marks* —and the Opinion is replete with language that makes it plain that Instrumentalist's use is a trademark use (as is defendants' infringing use). Dilution of Instrumentalist's marks, used only in connection with the Sousa Award, of course dilutes the value of the Award itself precisely *because* it dilutes the value of the marks. Defendants' offered distinction is simply untenable.

■ Second, defendants claim insulation from the Act by virtue of Ill.Rev.Stat. ch. 140, § 21 ("Section 21"):

> Nothing herein shall adversely affect the rights or the enforcement of rights in marks acquired in good faith at any time at common law.

nois law (see *National Can*, 505 F.Supp. at 148 n.2, and *In re Air Crash Disaster*, 644 F.2d 594, 606 (7th Cir. 1981)) as producing the same result. *Edgewater Beach* would still be the choice in this area.

**6.** *Alberto-Culver* has no independent significance in this context, for it was simply applying Illinois law just as this Court is, a process in which the state court cases control. Thus the later Court of Appeals decision in *Berghoff Restaurant Co. v. Lewis W. Berghoff, Inc.*, 499 F.2d 1183, 1185 (7th Cir. 1974) relied on *Edgewater Beach* (as this Court has) as controlling authority. Moreover, the statement from *Alberto-Culver* on which defendants seek to rely was no more than a dictum, citing in its support only federal (and not *Illinois*) cases construing the Act.

Defendants' argument, without citing authority, is that because they "acted in good faith" in adopting the Sousa likeness Section 21 precludes any action against them under Illinois law. As a matter of statutory construction, Section 21 does not modify Section 22 in any case.[7] But even if it did, Section 21 was clearly intended to preserve rights existing under common law at the time the Illinois Trademark Act was enacted (1955), and *not* to excuse violations after that date simply because such violations were unknowing. Because defendants "adopted the Sousa likeness" only last year, they are not protected by the saving clause of Section 22 or, for two independent reasons, by Section 21.

2. *Enjoining Defendants' Actions Outside Illinois*

■ Defendants maintain that under "conventional principles of conflicts of laws" the injunction may properly enjoin activity only within Illinois because it is predicated on a violation of Illinois law. Instrumentalist has urged and this Court has issued a form of order enjoining certain of defendants' activities nationwide.

None of the authorities cited by defendants addresses the situation presented here: Instrumentalist has asserted a protectible *Illinois* property right and now seeks to enjoin conduct in Illinois and elsewhere affecting its value. It would be the height of absurdity to hold that Illinois had a legitimate interest in protecting vested rights (especially those of Illinois residents)

against dilution but that, having acquired jurisdiction over an offender, courts sitting in Illinois would be helpless to deal with dilutive acts once they crossed state lines. It may be noted for instance that our Court of Appeals upheld injunctive relief without indicating any such restriction in *Polaroid Corp. v. Polaraid, Inc.*, 319 F.2d 830 (7th Cir. 1963) (where defendant did an interstate business in Illinois, Indiana and Iowa). Further examination would likely multiply the examples.

This Court has personal jurisdiction over defendants and therefore undoubtedly has the "power" to enjoin defendants' activity outside Illinois. Restatement of the Law (Second) of Conflict of Laws § 53. Furthermore the actions required of defendants by the Order do not entail the violation of other state laws,[8] nor do they curtail defendants' exercise of any rights affirmatively granted under such laws. In short, nothing before the Court suggests that Instrumentalist is not entitled to full protection of its Illinois property right in a single action, rather than the most minimal protection it would receive should defendants' argument on the geographical scope of the Order be adopted.

3. *Marine Corps as an Indispensable Party*

■ Defendants' argument that the Marine Corps is an indispensable party, so that its non-joinder in this action requires dismissal, is equally without merit. Instrumentalist has not complained that "in [the

---

7. Section 21 was Section 14 of the Illinois Trademark Act of 1955 ("An Act to provide for the registration and protection of trade-marks, service marks and trade-names, to make an appropriation in connection therewith, and to repeal an Act herein named"). It follows the comprehensive codification of Illinois trademark law found in Sections 1–13 of the Act, Ill.Rev.Stat. ch. 140, §§ 8–20. It was obviously aimed at the non-destruction, by those prior sections, of previously-existing rights "at common law." Though enacted at the same time as Section 15 of the same Act and in the same legislative bill, the Anti-dilution Act was totally self-contained—so much so that it contained *its own* savings clause: "except that the provisions of this section shall not deprive any party of any vested lawful rights acquired prior to

the effective date of this Act." Accordingly the Court determines that the "Nothing herein..." language of Section 21 means "nothing in the first 13 sections of the Act" and does *not* encompass the Anti-dilution Act.

8. In fact defendants themselves have referred to 16 state anti-dilution statutes other than that of Illinois, under which the same relief granted here may have been authorized. Reply to Plaintiff's Response to Defendants' Comment on Proposed Preliminary Injunction Order, at 3 n.1. It may also be possible that "dilution of a mark" is actionable at common law in other jurisdictions. This Court need not, nor will it, undertake an exhaustive survey of anti-dilution law in the 50 states.

Marine Corps'] absence complete relief cannot be accorded among those already parties" (the test under Rule 19(a)(1)), for it is satisfied with the relief afforded by the Order against defendants. If as defendants urge the Corps is protected by sovereign immunity from the power of this Court, it has full power to protect its interests free from judicial interference, and the test of Rule 19(a)(2) does not require joinder. Even were that not the case and were Rule 19(a) read to require the Marine Corps "to be joined as feasible," the Court rules that the factors to be considered by the Court in determining whether dismissal is proper, set forth in Rule 19(b), weigh heavily in favor of Instrumentalist. Rule 19(b) speaks of "equity and good conscience," and the Court has already indicated that it does *not* view those factors as favoring either defendants or the Corps. "Equity and good conscience" should lead the Corps to commit itself to adhere voluntarily to the rights ultimately adjudicated between the parties, and not to assert sovereign immunity and lack of judicial power as a shield. Accordingly this action properly proceeded without joinder of the Marine Corps, and the Court will rest on the terms of the Order to make the duties of the parties clear.

### 4. *Specificity of the Order*

Defendants claim that the Order fails to comply with Rule 65(d) because (1) it is not specific in terms and (2) it does not describe in reasonable detail the act or acts sought to be restrained. This Court determines otherwise. As defendants acknowledge, "the standard of confusing similarity is a term commonly in trademark infringement orders." Defendants have wholly failed to demonstrate why that standard should be viewed as less specific where, as here, claims of dilution are involved. If anything, the "confusingly similar" test may be *less* burdensome than others that might be imposed in dilution situations. Furthermore, the rationale behind the "specificity" and "reasonable detail" requirements of Rule 65—facilitating compliance with the order and protecting defendants from possi-

9. This process is not burdensome, because only one award form is distributed each year.

ble contempt charges due to their failure to discern the scope of the order—is amply served in this instance. This Court has directed defendants to submit to it any proposed award form [9] before distribution, so that the Court may determine and defendants will know whether that form complies with the law.

### 5. *Defendants' Motion for a Stay Under Rule 62(c)*

Rule 62(c) authorizes the Court in its discretion to "suspend [or] modify" an injunction during the pendency of an appeal of the order granting the injunction. Defendants have stated they intend to appeal the Order and urge that a stay of the injunction under Rule 62(c) is appropriate.

"When an application for a stay of a district court order is made, the criteria to be employed in deciding whether it should be granted are much the same as would be employed on application to the district court for a preliminary injunction." *Collin v. O'Malley,* 452 F.Supp. 577, 579 (N.D.Ill. 1978). Specifically the criteria are (1) whether the movant has demonstrated a strong showing of likelihood of success on the merits of the appeal; (2) whether the movant will suffer irreparable harm in the absence of the stay; (3) the degree to which a stay will substantially harm the other party; and (4) whether it is "in the public interest" to grant the stay. *Id;* 11 Wright and Miller, Federal Practice and Procedure § 2904 (1973).

Defendants have not satisfied those criteria:

(1) For the reasons stated in the Opinion and in this opinion the Court does not consider defendants to have demonstrated the requisite "strong showing of likelihood of success."

(2) As to the second factor, the irreparable harm requirement, defendants may still distribute the same kind of band award they found suitable for the 13 years from 1967 through 1979, or a permissible Semper Fidelis (or other) band award, and that fact alone weighs heavily against defendants on this issue. Any

claimed hardships encountered because of the injunction are really of defendants' own making [10] and in any event do not rise to the level of irreparability.

(3) On the other hand, should a stay be issued, Instrumentalist's award (and marks) would suffer the dilutive effect of full promulgation of defendants' illegally designed award during the coming award "season." Thus the third criterion also favors Instrumentalist.

(4) Finally defendants have failed to identify (nor has the Court independently ascertained) any "public policy" that would be served by a stay.

### Conclusion

Defendants' motion to amend findings or in the alternative for a stay of the preliminary injunction is denied. For the reasons expressed in the Opinion and this opinion, the Order is entered concurrently herewith.

---

10. As stated at Opinion 5, defendants have issued a Distinguished Musician Award, which the Semper Fidelis award was designed to replace, since 1967. Fully cognizant of Instrumentalist's objections to the Semper Fidelis award and of the likelihood that this litigation would be instituted (see Opinion 26–29), defendants proceeded "full bore ahead" in distributing their modified award. Negotiation with Instrumentalist might well have allowed defendants to avert any alleged hardship in which they now find themselves.

Defendants object vigorously to that part of the Order directing them to mail letters to band directors apprising them of this litigation and characterizing the conduct of the Marine Corps if it were to distribute the certificates defendants had already put in the Corps' hands. They claim that the letters will cause irreparable damage to the reputation of their award. That "hardship" too could have been avoided had defendants and the Corps made voluntary arrangements, as they were free to do, to comply with the rights of the parties litigant as determined in this action.